IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

MICHAEL BERK,

    Plaintiff,

        v.

Civ. No. 17-91 (NLH)

D.J. HARMON, CHRIS POULSON,
M. ZUVER, FIVE DOE, L. INGRAM,
MIKE MORRIS, JORDAN HOLLINGS-
WORTH, A. CRISSON, R. ROBERTS,
H. THOMPSON, WILLIAM BICKART,
CAROLINE GARY, STACIE MARANTZ,
FOUR DOE, THREE DOE,
V. GONZALES, E. JOHNSON,
M. WHITE, M. STALLINGS,
L. ROGERS, H. GENTRY, MONICA
LASSETER, TWO DOE, ONE DOE,
JENNIFER CAPERTON,

    Defendants.

## COMPLAINT

Pursuant to the Court's jurisdiction under 28 U.S.C. §1331
and Bivens v. Siz Unknown Named Agents of Fed. Bureau of Narcotics,
403 U.S. 388 (1971), Michael Berk, Plaintiff pro se, a convicted
and sentenced federal prisoner, makes this Complaint against the
several Defendants named herein.

Plaintiff has separately moved to proceed in this action
in forma pauperis, and avers that no prior actions have been
brought by him in any federal court while incarcerated which
have been dismissed as frivolous or malicious, or for failure
to state a claim upon which relief may be granted.

- 1 -

Plaintiff is presently confined at FCI Seagoville.  The physical address of the facility is 2113 N. Hwy. 175, Seagoville, TX 75159.  His mailing address is: Michael Berk #43739-037, FCI Seagoville, P.O. Box 9000, Seagoville, TX 75159-9000.

Plaintiff has sought administrative relief through the Administrative Remedy process afforded by the Bureau of Prisons, as well as through informal means, as to the issues raised herein.  The results of these efforts are detailed in the Statement of Claims following.

Plaintiff requests a jury trial.

Plaintiff seeks injunctive relief in the form of an order requiring Defendants to correct his prison record, as well as to improve procedures with respect to provision of due process of law to him as well as to similarly-situated prisoners and with respect to preventing abuses like those complained of; he also seeks an order prompting the actual reversal of his transfer and his restoration to FCI Fort Dix; and he seeks enforcement of, and monetary damages for the violations of, his First Amendment rights to freedom of expression, privacy, association, and access to the courts for redress of grievances; his Fourth Amendment right to freedom from unreasonable search and seizure; his Fifth Amendment right to due process of law; his Eighth Amendment right to be free from cruel and unusual punishment; and his Fourteenth Amendment right to equal protection under the law; as well as an order compelling the restoration of seized correspondence and/or monetary damages therefor, and any other relief just and proper in the premises to resolve his claims against Defendants.

DEFENDANTS

D.J. Harmon, Warden, FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX 75159

Mr. Harmon: maintained and affirmed the violations of Defendants Chris
Poulson, M. Zuver, Five Doe, L. Ingram, Mike Morris, Two Doe, One Doe, and
Jennifer Caperton; as well as retaliated against my exercise of my First Amend-
ment rights by enacting or approving a change of my quarters assignment; and
further retaliated against and repressed my exercise of my First Amendment
rights by his words and actions in response to my complaints which, in part,
had referenced an effort to engage the assistance of a member of Congress in
seeking redress for my grievances, precluding my further appeal.

Chris Poulson, Staff Psychologist, FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX 75159

Dr. Poulson: improperly and/or fraudulently manipulated my prison record
in violation of my right to due process of law by writing, issuing, and appen-
ding to my file an incident report in retaliation for my exercise of my First
Amendment rights by casting an innocuous expression, arbitrarily, as supportive
of the objective to extend my confinement by civil commitment.

M. Zuver, Correctional Officer, FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX 75159

Ms. Zuver: mishandled my outbound mail, opening and reading it in vio-
lation of applicable policy and law, and flagging it, arbitrarily, as evidence
for use against me in civil commitment proceedings, without due process of law,
thus violating my First, Fourth, and Fifth Amendment rights including by the
concomitant interference with my interactions and relationships.

Five Doe, Special Investigative Supervisor, FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX 75159

Five Doe (true name unknown): fraudulently manipulated investigative
records to obstruct the goals of the Prison Rape Elimination Act (PREA), obscur-
ing the fact that my complaint of sexual victimization had indeed been corrob-
orated by witnesses, thereby causing and/or enabling violations of my Eighth
Amendment rights through further exposure to sexual abuse.

L. Ingram, Correctional Counselor, FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX 75159

Mr. Ingram: violated my Fifth Amendment rights by refusing to conduct a
disciplinary hearing in accordance with procedure and retaliated against my
exercise of my First Amendment rights by so doing and by entering on my record
a finding of guilt and punishing me with respect to my innocuous interaction,
expression, and relationship with a friend; as well as retaliating against my
exercise of my First Amendment rights by favoring an inmate over another in
executing a change of quarters to my detriment not for a legitimate reason but
as a result of my continued grievances, which he also mishandled; all result-
ing in further violations of my Eighth Amendment rights by further abuse.

Mike Morris, Unit Manager, FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX 75159

Mr. Morris: retaliated against my exercise of my First Amendment rights,
to wit, my repeated complaints and requests, by acts and omissions resulting

- 3 -

in his knowing exposure of me to continual abuse of a sexual nature, thus also
violating my Eighth Amendment rights, and by deliberate excessive quarters
changes which were extraordinary, punitive, and detrimental.

Jordan Hollingsworth, Warden, FCI Fort Dix
5756 Hartford-Pointville Rd., Joint Base MDL, NJ  08640

Mr. Hollingsworth: maintained and affirmed the violations of Defendants
A. Crisson, R. Roberts, H. Thompson, Stacie Marantz, Four Doe, and Three Doe;
as well as specifically authorized my transfer from FCI Fort Dix back to
FCI Seagoville on grounds retaliatory of my First Amendment rights to freedom
of expression, association, and access to the courts.

A. Crisson, Case Manager, FCI Fort Dix
5756 Hartford-Pointville Rd., Joint Base MDL, NJ  08640

Ms. Crisson: violated my Fifth Amendment right to due process of law by
the determination of guilt at a hearing conducted not in accordance with
applicable law and policy and by imposing punishment and manipulating my record
based on conduct which was protected by my First Amendment right of access to
the courts and which did not violate any posted rule, and thus was retaliatory of
that exercise of my right; and attempted to suppress my further access to such
procedures by withholding necessary paperwork and deliberately misleading me.

R. Roberts, Correctional Counselor, FCI Fort Dix
5756 Hartford-Pointville Rd., Joint Base MDL, NJ  08640

Ms. Roberts: violated my First Amendment right of access to the courts by
mishandling my outbound legal mail, also in retaliation for my exercise thereof.

H. Thompson, Correctional Counselor, FCI Fort Dix
5756 Hartford-Pointville Rd., Joint Base MDL, NJ  08640

Mr. Thompson: retaliated against my exercise of my First Amendment rights
of access to the courts and freedom of expression, refusing to accept (as was
his duty according to policy) my submission of legal mail for delivery to the
court and to the respondent in that action and writing and issuing a discip-
linary report for my attempt to do so, all in retaliation for my earlier exer-
cise thereof.

William Bickart, Behavioral Management Programs Coordinator, BOP
320 1st St. NW, Washington, DC  20534

Dr. Bickart: in violation of my right to due process of law, and in retal-
iation for my exercise of my First Amendment rights of freedom of expression
and of association and of prosecution of grievances (for my having successfully,
by way of a court filing just three (3) months earlier, forced the reversal of
a related position maintained by his department for some 2¼ years against my
administrative appeals, and for the nature of my expressions and associated
relationship against which his staff had deployed so much disintegrative effort),
vacated a determination that my conduct was unactionable and directed that the
same conduct, in the context of the reversed position and related fraudulent
premises in my record, serve as grounds to transfer me away from family and to
impose new restrictions on my rights, all in serious interference with and
destruction of my relationship with my then-fiancee.

Caroline Gary, LMSW, Designation and Sentence Computation Center (DSCC)
346 Marine Forces Dr., Grand Prairie, TX  75051

Ms. Gary: by entering the transfer and referral order into my record, and
manipulating same to fraudulently support a conclusion that my conduct met a

policy definition warranting indefinite extension of confinement, and, without due process of law, caused to be processed the transfer away from my family and imposition of restrictions upon my rights, violated my First Amendment rights to freedom of expression and to association, also retaliating against me for my exercise of same, seriously interfering with and effecting the destruction of my relationships.

Stacie Marantz, Chief Psychologist, FCI Fort Dix
5756 Hartford-Pointville Rd., Joint Base MDL, NJ  08640

Dr. Marantz: having first found my conduct unactionable (on record), upon re-conferring with Dr. Bickart, arbitrarily changed the determination (which was hers to make, according to policy) to reflect falsely that the conduct met a policy definition warranting indefinite extension of confinement, and without due process of law thus retaliated against my protected activities, resulting in my detrimental transfer away from family and the imposition of severe restrictions upon my further exercise of my rights, all with serious destructive effect upon my relationships; and violated my First Amendment rights by the censorship of my expression and connection with my fiancee.

Four Doe, Mail Room Officer, FCI Fort Dix
5756 Hartford-Pointville Rd., Joint Base MDL, NJ  08640

Four Doe (true name unknown): mishandled my outbound mail by arbitrarily opening, reading, copying, and disseminating it without due process of law and in violation of established law and policy, infringing upon my First Amendment rights and violating my Fourth Amendment and Fifth Amendment rights, particularly where mail seized incident to unreasonable searches was confiscated, and, violating my First Amendment rights, censored.

Three Doe, Mail Room Officer, FCI Fort Dix
5756 Hartford-Pointville Rd., Joint Base MDL, NJ  08640

Three Doe (true name unknown): mishandled my inbound legal or "special mail" by, instead of processing it in accordance with policy and law, outside of my presence opened, read, copied, and disseminating same without due process of law, in violation of my First Amendment, Fourth Amendment, and Fifth Amendment rights.

V. Gonzales, Disciplinary Hearing Officer, South Central Regional Office (SCRO)
344 Marine Forces Dr., Grand Prairie, TX  75051

Mr. Gonzales: in retaliation for my having appealed a precursor disciplinary finding, and for my original composition, both exercises of my First Amendment rights, and in violation of my Fifth Amendment right to due process of law, arbitrarily and excessively punished me and abused me, also fraudulently manipulating my prison disciplinary record.

E. Johnson, Unit Manager, FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX  75159

Mr. Johnson: retaliated against and repressed my exercise of my First Amendment rights by effectively forcing the termination of my further appeal in response to my filing of a grievance, interfering in my access to due process of law and thus promoting and/or further enabling, inter alia, abuses of policy respecting the handling of my mail and other subjects of my complaint.

M. White, Disciplinary Hearing Officer, South Central Regional Office (SCRO)
344 Marine Forces Dr., Grand Prairie, TX  75051

Mr. White: arbitrarily found me guilty of a nonexistent disciplinary

offense in retaliation for my exercise of my First Amendment right to freedom of expression, thus violating my Fifth Amendment rights.

M. Stallings, Lieutenant, FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX  75159

Lt. Stallings: in retaliation for my exercise of my First Amendment right to freedom of expression, manipulated my record by recording improper and fraudulent conclusions so as to violate my Fifth Amendment right to due process of law with respect to the investigative process surrounding a disciplinary action.

L. Rogers, Special Investigative Supervisor, FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX  75159

Mr. Rogers: in retaliation for my exercise of my First Amendment right to freedom of expression, manipulated my record in a deliberately inflammatory and fraudulently misrepresentative manner so as to violate my Fifth Amendment right to due process of law with respect to the investigative process surrounding a disciplinary action.

H. Gentry, Lieutenant, FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX  75159

Lt. Gentry: in retaliation for my exercise of my First Amendment right to freedom of expression, manipulated my record in an order establishing my placement in punitive segregation for a fraudulent and arbitrary purpose, pretextual for the retaliatory motive, so as to violate my Fifth Amendment right to due process of law with respect to the investigative process surrounding a disciplinary action, amounting to an abuse of discretionary authority.

Monica Lasseter, (title unknown), FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX  75159

Ms. Lasseter: violated my Fourth Amendment right to freedom from unreasonable search and seizure as well as my Fifth Amendment right to due process of law and my First Amendment rights in confiscating and refusing to return or otherwise handle inbound mail addressed to me, and by manipulating my record so as to reflect that the fact of some other person's sending unsolicited content to me warranted indefinite extension of confinement.

Two Doe, Mail Room Officer, FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX  75159

Two Doe (true name unknown): mishandled my outbound mail by arbitrarily opening, reading, copying, and disseminating it without due process of law and in violation of established law and policy, infringing upon my First Amendment rights and violating my Fourth Amendment and Fifth Amendment rights, particularly where mail seized incident to unreasonable searches was confiscated, and, violating my First Amendment rights, censored.

One Doe, Mail Room Officer, FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX  75159

One Doe (true name unknown): mishandled my inbound legal or "special mail" by, instead of processing it in accordance with policy and law, outside of my presence opened, read, copied, and disseminated same without due process of law, in violation of my First Amendment, Fourth Amendment, and Fifth Amendment rights.

Jennifer Caperton, Sex Offender Management Program Coordinator, FCI Seagoville
2113 N. Hwy. 175, Seagoville, TX   75159

Dr. Caperton: interfered with my relationships and interactions, violating
my First Amendment, Fourth Amendment, and Fifth Amendment rights where she
manipulated my record and imposed orders and restrictions as to my communications
and connections with people, all without due process of law, executing arbitrary
searches and seizures of my correspondence and written compositions, forcing me
to say certain things to people with whom I had or sought to develop or maintain
relationships, as well as not to say or do, or read or see or possess, or receive
or send, whether passively or actively, a category of things or concepts which
was ill-defined, and not done in accordance with relevant policy, having destruc-
tive effect upon my relationships and in retaliation for my exercise of my First
Amendment rights.

//

//

//

//

//

//

//

//

//

//                 THIS SPACE INTENTIONALLY LEFT BLANK.

//

//

//

//

//

//

//

//

//

- 7 -

STATEMENT OF CLAIMS

1.    I was born in New York City in 1980; adjudged at age 6 by a psychiatrist to
have exhibited an IQ of 162, I was shuffled back and forth between accelerated
educational programs with an emphasis on computers.  Following years of trauma, on
reaching adolescence I experienced the horrific attempt of my alcoholic father to
murder my mother while the neighborhood ignored my pleas for help.  She, my brother,
and I moved with my grandparents to Ocean County, NJ, and I rarely saw him again
until, in my mid-20s, my father asked for my help as his health was poor.  I moved
out to Arizona with my girlfriend of several years and tried to build a relation-
ship with my father while simultaneously working to advance my career in informa-
tion technology.  A V.A. surgeon obtained my ignorant approval to operate as he had
fallen unconscious while I was on a business trip in Baltimore; my father never re-
gained consciousness and died before I could return in early 2007.  He was aged 62.
I became emotionally abusive, turned inward, abandoned my wholesome partnership,
rejected all structure, and embarked on a self-destructive risk-seeking boundary-
pushing escapade.  I spent a year with a woman barely of drinking age in an "open"
relationship exploring roleplay and multiple partners, one of which collective
engagements resulted in my arrest in August of 2008.

2.    My federal prosecution ran through 2010, during which period I was housed in
county jails with men who confided to me of their abuses of very small children,
as well as made clear the certainty of their further such acts upon release from
the one- and two-year sentences they received.  My appointed lawyer approached the
government with my concerns and ideas for more effective protection of the public,
but was rebuffed; I'll never forget one such response from law enforcement, deli-
vered while laughing in my face: "That's rich!"  During the 2½ years I was "pre-
trial," with no exposure to the light of day or fresh air, 13 months of which I
spent in solitary confinement, I was abused and assaulted due to the nature of my
crime (non-contact internet-based sex offenses involving illegal images of minors);
upon my entering the custody of the Bureau of Prisons (BOP), I was promptly assaul-
ted again at ALF (the Low Security Correctional Institution an Allenwood, central
Pennsylvania), as a direct result of which I was placed in the Special Housing Unit
(SHU) and eventually transferred to SEA (the low-security Federal Correctional
Institution in Seagoville, northern Texas) for protective custody in June of 2011.

3.    On 9/30/2011 I reported to a 7:30 "call-out" (scheduled appointment requiring
attendance) at which Dr. Jennifer D. Caperton, Ph.D., LSOTP, delivered to me an
envelope postmarked 8/4/2011 and addressed to me from Ms. K. Miller, a free adult.
As Program Statement (PS) 5265.13 directed that "monitoring procedures may not
interfere with mail handling," I raised the issue of the 55-day withholding of my
mail in a "BP-8" (the first step, required by local procedures, in the Administ-
rative Remedy process, PS 1330.18, 28 C.F.R. §542.10 et seq.), alleging harassing
interference with my communications and relationships.  The response of Counselor
Lisa Jordan on 10/6/2011 generally promised that the issue would be taken care of.

4.    The problems, however, persisted, consisting of delays in processing, as well
as censorship, of communications between myself and members of the public, inter-
ference with and improper handling of legal or attorney-client-privileged "special
mail" (defined in 28 C.F.R. §§ 540.2(c), 540.18-19), and verbal harassment by staff
targeting my expression and contacts with civilians, usually associated with derog-
atory and abusive comments related to the nature of my criminal charges.

5.    In addition to ineffectual "cop-outs" (written exchanges with staff based on
inmate requests) seeking to address this interference, including to the Mail Room
on 10/12/2011 respecting my correspondence with Ms. Miller -- during the nearly

two months' delay before Dr. Caperton gave me her letter, she and I had argued as to whether it had truly ever been sent, and her subsequent letter of 10/11/2011 was also delayed (far less dramatically) until 10/18/2011 (days following the conclusion of the BP-8 I had filed), but the damage had been done to the relationship and despite my conciliatory replies (which I could not confirm were ever delivered) I never heard from Ms. Miller again -- on 3/15/2012 I sent another cop-out to the Mail Room regarding excessive interference with my mail resulting in damage to my relationships and repression of the expressions of involved parties. For example, on 1/4/2012 I had received an envelope from Ms. C. Adams missing contents but without a "confiscation form" (i.e., a BP-A0327 or BP-A0328 form as prescribed by PS 5265.14); despite my efforts to reconcile the loss with Ms. Adams, she either refused to continue the relationship or our connection was permanently disrupted by BOP staff, because I never heard from her again; on 2/3/2012, I had received during general mail call on the unit properly-marked special mail postmarked on 1/27/2012 from my attorney which had been opened outside my presence in violation of policy; again, on 2/6/2012 the same occurred with respect to special mail postmarked on 2/3/2012, contrary to policy; on 2/27/2012, I received 3 pieces of mail, postmarked 2/21/2012, 2/21/2012, and 2/8/2012 (this last piece from my mother, Ms. L. Berk, and obviously much delayed); on 3/13/2012, I received 3 pieces of mail, postmarked 3/7/2012, 2/29/2012, and 2/10/2012 (this last piece from Mr. J. Silva; this was my last contact from Mr. Silva). The written response from Mail Room staff dated 3/20/2012 was noncommittal.

6. On 5/4/2012, my outbound mail to Mr. S. Tham was opened, the contents removed, and the envelope returned to me empty; despite further efforts, I never received a response from Mr. Tham. Thus I allege that these incidents, which have continued in kind through the present date, comprise violations of my Fourth, First, and Fifth Amendment rights to freedom from unreasonable search and seizure, of expression, to association, and to due process of law, which violations were committed by specific staff members not all of whose names I know at the present time but which can be discovered, (herein called One Doe and Two Doe).

7. On 5/16/2012, Ms. Monica K. Lasseter advised me at a call-out that staff had intercepted a piece of mail addressed to me. She showed me an outbound written request of mine seeking penpal information, and told me that in addition to the requested information the responding party had enclosed an advertisement depicting a hand-drawn bikini-clad black-and-white female figure about 1½ inches in size. Because I had not requested that material, she afforded me a "warning," but also refused to give me the mail addressed to me, asserting that it was "risk-relevant."

8. "Risk-relevant behavior" is defined in PS 5324.10 as: "Institution behavior related to a sexual offender's history that indicates risk of future sexual offending upon release (e.g. an inmate convicted of child pornography who collects pictures of children; a sex offender who attempts to contact potential child victims)." A record of risk-relevant behavior (RRB) increases the actuarial level used to certify an inmate for civil commitment, per PS 5394.01. Civil commitment, a process authorized by statute, 18 U.S.C. §4246, effectuates the indefinite confinement beyond his prison term of a sex offender. To me, this possibility is the most frightening and scary thing I can imagine happening, because in part of all that imprisonment encompasses and because to bring it about appears to require diminished due process of law, where the target's record is controlled by persons who are not obligated to consider unbiased facts or circumstances.

9. I sought that the mail addressed to me be properly handled and not forfeited by sending a cop-out to Ms. Lasseter on 6/2/2012. Her 6/15/2012 written response expressly declined to follow "confiscation form" procedures and stated that I could not possess the mail, as it was considered contraband.

10.  Since my arrival at SEA, I had been employed (pursuant to the Inmate Performance Pay program, 28 C.F.R. §545.20 et seq., and the Thirteenth Amendment❯ in the Education Department, first as a GED tutor and then as an Adult Continuing Education clerk.  I consistently was granted bonuses based on accolades, and my monthly compensation rose from $5.25/month to over $60.00/month.  But in June of 2012, the institution's administrative staff began to override the positive work performance ratings of my supervisor, Ms. K. Neely, editing my performance pay sheets after their approval to reflect poorer-quality assessments, crossing out positive praise, denying bonuses, and capping my pay, despite that said staff had no direct knowledge of my work performance and that such interference with my records was not exacted upon other similarly-situated inmates.  I inquired into the reasons for this, and Mr. J. Harris, Education Technician, advised that Ms. M. Melendez, Supervisor of Education, had actively made the changes.

11.  On 7/31/2012, I discovered (via the "change sheet" posted in my housing unit) that I had been abruptly terminated from my job in Education.  On 8/1/2012, I was summoned to Ms. Melendez's office and abused by her at length.  The crux of her contemptuous verbal tirade, which culminated in her direction that I never cross her path again, was: "We know all about you; I've read your case; you'll never amount to anything; we will make sure that you never go home; we control everything about your records; I will make sure that you are civilly committed."  I particularly remember the direct and deliberately cruel way in which she presumed to educate me as to what that threat meant: "Do you know what civil commitment is? ... It means you will never, ever go home again.  How does that make you feel, Mr. Berk?  Now I want you to remember that I made this promise when it happens." I was stunned; the experience felt unreal; I realized that I was captive and at the whims of people who would do me harm because they had decided it should be so. I was very afraid and felt horribly helpless and doomed.

12.  I immediately reported the incident to Dr. Chris L. Poulson, Psy.D., and to Ms. Stephanie Ruiz, my assigned case manager, who contacted Dr. Caperton on my behalf and attempted to quell my concerns on 8/2/2012.  I also promptly spoke with Recreation Specialist Mr. Dyrron Boykin, for whom I had supplied my expert assistance in developing the facility's Health and Wellness Program, and Ms. Neely, as involved staff whom I considered reasonable.  They each advised me that the behavior was entirely consistent with their experiences and knowledge of Ms. Melendez, who had a history of psychological disorders and manipulative conduct and who outranked all of these staff; for these reasons, their advice consistently was that I avoid her and keep my head down.

13.  The interference with my mail and relationships continued and I was forced to work cleaning trash from the compound on the Yard Detail at $5.25/month, thus costing my supporters more of their money for my subsistence (inmates at SEA must purchase their own hygiene products and pay for stationery, postage, and telephone calls, among other basics, and the drop of over $55.00 per month in my account made an impression, being some 1000% of my now-limited pay).  My attempts to secure a job in other departments, including the Chapel, Psychology, and Recreation, failed as all staff were afraid to cross Ms. Melendez; even today, despite having been recruited to work as a tutor for inmates with disabilities and special learning needs at another institution later, at SEA I am limited to $5.25/month (albeit as a clerk for the Compound Department overseeing the Yard Detail).

14.  In addition to my outbound mail often being censored without notice to me (including a particularly distressing instance wherein a letter I had sent to my former employer, Mr. S. Asensio, on 6/11/2012 arrived at its destination empty and re-sealed), in numerous instances my inbound mail from unknown senders was intercepted and not delivered.  I only learned of these incidents when, for example,

in the course of administering abuse, staff verbally advised me of their having done so; I have never received a confiscation form, nor to my knowledge have any of my correspondents, issued by staff at SEA even though pertinent policy has been followed in my case at another institution and is followed in the cases of other inmates.

15. On 10/24/2012, my mother, Ms. L. Berk, sent two emails to the Executive Assistant at SEA in which she complained of the "practice" at the facility of holding back her mail to me, which upset her very much because she was unable to visit me, so far away; she stated that she does not believe that said practice is legal, and mentioned that Mr. Asensio had told her of the incident involving the empty envelope. On 11/1/2012, the Executive Assistant replied to my mother that her concerns had been forwarded to the supervisor over the mail process, and promised an update which never materialized. Accordingly, on 12/5/2012, my mother submitted a printed letter to SEA complaining of the mail interference and referencing the preceding email exchange, explaining that her emails had appeared to have had some effect when immediately thereafter I had been given a large quantity of mail that had been withheld for some time. She wrote: "I live on the east coast and it is most likely that I will not be traveling across country to visit him. It hurts me to the core knowing that the only communication I have with him is through mail and it is held back. It is one thing to open mail for inspection but when it results in loss of contents or holding mail back that is ... cause for concern." This expression, in turn, hurt me to the core, to know that my poor mother was experiencing such anguish as compounded beyond the circumstances directly caused by her son's unlawful acts. My mother also followed up with a letter to the Director of the BOP, Charles E. Samuels, Jr., on 2/3/2013, and another email to the SEA Executive Assistant on 2/15/2013, describing specific interference and harms; no response ever came.

16. On 12/14/2012, my former employer, Mr. Asensio, submitted a similar letter to SEA referring to mail as "the only means by which we can continue contact" and declaring that "it is very distressing to me that I have not received all of Michael's correspondence to me, and that in one instance I received an open envelope without the contents." (Mr. Asensio, who is the owner and managing director of the marketing analysis firm for which I served in the capacity of I.T. Manager prior to my arrest, later averred that it was his seasoned experience that first-class mail ordinarily takes 2-3 days in transit within the continental U.S. It is the common experience of inmates at SEA, myself included as applicable, that mail is sent and delivered on a "same-day" basis, including standard inspection for contraband: Inbound mail is picked up from the post office in the morning, sorted and reviewed, and distributed to the housing units in the afternoon; outbound mail placed with staff by the preceding evening is sorted in the early morning hours and taken to the post office during the pick-up run. My own receipt of some mail items only 2-3 days following the postmark date bears out this understanding. However, a letter Mr. Asensio sent on 1/11/2013 was not delivered to me until 1/24/2013; another letter he sent on 4/24/2013 was not delivered to me until 5/29/2013. Mr. Asensio personally noted, in a later missive, that an envelope sent from me on 2/1/2013 was never received by him. He stated: "These manipulations directly affect the quality of our communications. As an example, when I did not receive a reply to my letter of 1/11/2013, I sent a second letter on 4/24/2013 expressing my concern that Mr. Berk's lack of response might be indicative of ill health. Even that letter, and subsequently its response, was delayed, the cumulative effect being that the most recent two letters I have received from Mr. Berk were dated on 1/7/2013 and 6/10/2013, decimating the normal frequency and temporal pertinence of our correspondence.")

17. On 1/31/2013, my friend, Ms. D. Sellard, wrote to SEA "to state [her] concerns" as "a private citizen," "requesting that [she] be able to continue to communicate

issue involve nonconsensual touching and an element of force, i.e., rape; the latter requires use of the mail in a manner explicitly contrary to federal or state law. The "Description of Incident" section of the form stated that "the parent of Alex Giovanoni" had complained that I had been "sending letters" with "sexually explicit" content to the parent's child, who -- according to the report -- was "autistic," and which letters were -- again, according to the report -- "an attempt to take advantage of" the child "sexually." The report was authored by Officer L. Rogers and dated 1/8/2013 despite that it alleges that "staff became aware" of the incident on 12/17/2012 and that I was placed in the SHU on 12/11/2012 (PS 5270.09 limits the time between staff's discovery of the charged conduct and provision of the incident report to the charged inmate to a maximum 24 hours).

20. Lt. Stallings, who was assigned to the post of SHU Lieutenant at the time, advised me upon delivery of the incident report (i.e., on 1/8/2013) that he was the "investigating officer" for said incident. He read the charges to me and asked me for a statement. I was flabbergasted. I admitted to having composed a creative work for Alex at his own request and based on the suggestion and encour-agement of our mutual friend, Casey Weiss. I denied the intimations that Alex suffered from any mental disorder or emotional disability because I knew him to be immensely intelligent, articulate, and successful not just professionally but also socially and academically. I vehemently denied the notion that he was a child or otherwise under any form of parental guardianship, and suggested that Lt. Stallings speak with Casey and Alex to corroborate my position that the composition had been grossly misinterpreted and taken out of context by persons neither parties thereto nor initiates of the somewhat esoteric content thereof. I also asked several times how someone could possibly be raped through a fence, given that I was in prison while Alex was not, and pointed out that neither was I homosexual nor did my record, as developed by the evidence proffered at my criminal trial, allow much room for such a suggestion.

21. Apparently, according to the hard copy of the incident report provided later, Lt. Stallings recorded very little of this, mischaracterizing my defense as that the writing had been "a joke," and falsely indicating that I "did not request any witnesses." Importantly, in the section labeled "Investigator's Comments and Conclusions," Lt. Stallings wrote: "Based on the inmate's own admission it is my conclusion that the inmate is properly charged with Attempted Sexual Assault & Attempted Illegal Use of Mail." I had never admitted to attempting to sexually assault anyone, yet this statement was now in my record. (While the incident was, much later, expunged, these records remain in my file and would appear to somehow comprise competent evidence.) Moreover, regardless of that aspect of the charges, authorship of a composition on paper can never comprise a physical assault, and the contents of that composition cannot possibly have violated any criminal statute (unless perhaps the intended recipient were indeed a child, which could reasonably be inferred as evidence of my incorrigibility with respect to repetition of my crime of conviction -- which consideration, I submit, is the true reason for these manipulations of my record, as presaged by Ms. Melendez's threats on 8/1/2012). Lt. Stallings also wrote, in the same section, that "specifically the portion [of the incident report] indicating what the inmate wrote," in addition to the fact that "Inmate Soto was identified by staff and admitted to this investigator he wrote the letter," supported his personal and professional "conclusion that the charges of 114A & 196A are substantiated by the facts." Factual and legal impos-sibilities aside, no information about "Inmate Soto" was ever provided to me. Policy expressly precludes, if due process means anything in prison, application of the formal definitions of the cited codes to the described (non-contact, non-illegal) conduct. Finally, Alex at the time was aged 23, lived in Saint Louis, was not of diminished mental capacity -- in fact, at the time of the incident, he

had attained his B.S. in Sociology at Fordham University and was pursuing his Master's degree (later attained summa cum laude) at St. Louis University, simultaneously working as an assistant there (he later entered the workforce as a contractor to the RAND Corporation). He and I had been introduced some time earlier by our mutual friend Casey Weiss because we share several intellectual and academic interests; our communications prior to the incident centered around such subjects as social psychology, Eastern philosophy, self-awareness, travel, music, and life in general. Casey, thinking that it would make a cool gift, suggested that I craft a creative work for Alex focusing on his legal but private interest in dominance and submission (a decidedly sociological concern) because of my own related experience. He discussed the idea with Alex before even broaching it to me, and I had only agreed because it was consensual and very clearly not "risk-relevant" per the policy definition.

22. I immediately submitted, on 1/8/2013, a written statement to SHU staff explaining the mischaracterization and requesting unbiased consideration. I wrote: "Alex Giovanoni is an adult. He is employed as an assistant in the Sociology program at St. Louis University while simultaneously pursuing his Master's degree .... He is extremely intelligent and certainly not of diminished capacity. A crude literal interpretation of the communications at issue, by a party unfamiliar with their purpose, is simply not appropriate in this case. ... I see no representation of Alex's position here ... the letter was crafted 'in character' solely for his appreciation as a creative entertainment device. ... The allegation is absurd in this context, and ... amounts to blatant persecution. Please review the incident with an independent eye." I further supported this position verbally, explaining that the letter did not and could not comprise an attempt to abuse anyone, and was purely academic in character despite the use of "terms of art" not familiar to the uninitiated (which the intended recipient was not). Yet at no time did staff allow the corroboration of these facts by contacting Alex himself, and Casey's pleas for consideration, written and spoken to staff, of his material knowledge, were ignored.

23. On 1/16/2013 and 1/18/2013, respectively, I sent cop-outs to Ms. Ruiz, my assigned case manager: "Could you please meet with me at the SHU to discuss confidential matters for a few minutes in private?" and requesting, due to interference involving delays of "19, 26, 32, 56" days, that my mail be handled so as not to be overly destructive of my relationships. Ms. Ruiz later told me that she refused to have anything to do with me because the charges, as related to her by staff (i.e., that I was trying to rape a retarded kid), "made [her] want to throw up every time [she] saw [me]" and because she hoped that I would be transferred, as Mr. R. De La Torre, my assigned counselor, had suggested, to a U.S. Penitentiary before she would have to deal with me. This kind of staff evasion of duties and distaste for me continued indefinitely thereafter, promoting general problems for me during life in prison.

24. On 1/11/2013, Mr. De La Torre conducted a hearing as chairman and sole member of the Unit Disciplinary Committee (UDC) at which I appeared, inside the SHU, handcuffed. (It was just me and him in the room; despite that UDC hearings generally require two staff members, I was given to understand that no one wanted to be near me or have to hear of my complaints.) He recorded my statement that "I did not attempt to sexually assault this person and this person is not of a diminished mental capacity .... Furthermore, this person is an adult." He based his decision to refer the incident, as charged, to the Disciplinary Hearing Officer (DHO) on my admission to having composed the material despite my denial that "the letters contained sexually explicit wording which could be deemed of an attempt to sexually assault this person."

25. On 2/15/2013, still in the SHU awaiting a DHO hearing, I submitted a "BP-9" (the first formal step in the Administrative Remedy process, 28 C.F.R. §542.14) based on a

- 14 -

BP-8 (the prerequisite informal step thereto, §542.13) I had prepared on/about 1/5/2013 but to which staff had failed to respond. This BP-9 detailed problems with access to property and legal resources, as well as legal contact information, while in the SHU, and focused on the fact that my incoming/outgoing mail had been consistently tampered with, delayed, withheld, and destroyed in violation of policy. I cited the repression of expression and destruction of relationships, as well as the psychological effects of this treatment, recalled relevant incidents of staff verbal abuse (including the 8/1/2012 threat to ensure my civil commitment by way of manipulation of my records), and requested correction of the mail issue. Attached to the BP-9 were the BP-8, statements from Ms. Sellard, Ms. Berk, and Mr. Asensio, and a "non-exhaustive incident list" containing much of the aforementioned, with a particular emphasis on communication issues affecting my relationship with, e.g., Ms. Sellard: For example, outbound mail sent 1/18/2013, 1/24/2013, and 1/25/2013 received in an "opened" state by Ms. Sellard on 2/1/2013, 2/2/2013, and 2/4/2013 respectively; inbound mail postmarked 1/10/2013, 1/14/2013, 1/15/2013, 1/18/2013, and 1/19/2013 from Ms. Sellard delivered to me in a "batch" of mail totaling 17 pieces all at once on 1/24/2013. Additionally, the BP-9 cited cop-outs sent on 1/17/2013 and 1/30/2013 to Dental Services and the Health Services Administrator, respectively, but responses to which were never received. (It was only much later, in reviewing my institutional file, that I discovered that the Chief Dental Officer had apparently responded to my request; I had never received it by ordinary means.) This BP-9 was assigned #725516 by L. Vanderslice on 3/8/2013 upon receipt at the Warden's Office.

26. Finally, on 2/26/2013, I was brought to attend a DHO hearing in person before Mr. M. White, DHO. I had, at the UDC hearing with Mr. De La Torre, reserved my rights to present evidence, call witnesses, and have the assistance of a staff representative; but, as I had been afforded no opportunity to exercise those rights (my staff representative, Mr. Dyrron Boykin, Recreation Specialist, had not answered any of my repeated written requests for conference and assistance), I told the DHO that I felt disadvantaged in what I perceived to be a surreal and prejudicial situation. Mr. White "leveled with" me, advising that he had been directed to find me guilty but that he was able to see that the case was manufactured and unsupported by the evidence. However, the staff who had charged me with the violation, according to Mr. White, would not "allow" me to "get off" without a finding of guilt and some punishment on the record. Due to this "political pressure," Mr. White first offered me "loss of general mail privileges for six months." He actually asked: "Would you take that?" I was unprepared for such an exchange, and felt stunned. (Later, Ms. Ruiz called Mr. White from her office with me standing by, and he explained that he thought that the charges never should have been handled in the way that they had been.) Having gone into the hearing expecting to be fighting for my life (in the context of defense against civil commitment), though, I easily enough told Mr. White that, especially as I had done nothing wrong and absolutely was not guilty of the charges (a fact he obviously sympathized with), and because I would never intentionally limit my own freedom of expression, and felt that I should be allowed an opportunity to contribute to the record, I would not be able to "accept," at least not willingly, such a restriction and outcome. Mr. White then offered to "suspend" the mail sanction demanded by his colleagues, but said that he had to give me "at least 7 days' disciplinary segregation" because "they won't let you out right away anyway." I admitted that "seg time" of such a low duration meant virtually nothing to me given that I had already spent so much time in the SHU; he jumped on the concession and said: "I found the 100-series charges are unsupported by the record. I find that you are guilty of committing a violation of Code 396," which is a lowest-severity catch-all rule applicable to the most minor of infractions not covered by other codes involving use of the mail. As Mr. White was lifting my shackled body to leave the small room, Mr. Boykin

- 15 -

showed up at the door.  I was confused by the rapid turn of events -- it was obvious to me that Mr. White "got it" but I had not been allowed to fully clear my name because Mr. Boykin had not fulfilled his duties with respect to my due process rights, nor had he even been present at the scheduled hearing or met with me at all since my placement in the SHU (apparently for the same reason that Ms. Ruiz refused to see me: all of the staff had been advised that I was a horrendous child rapist and to let the administrative machine process me out).  However, in rapid conference these two officials pointed out to me that I had "gotten away with" far less-severe sanctions than had been originally threatened by the 100-series rape and criminal charges, and I allowed myself to be led, shackled, back to my segregation cell.

27.  The next day, on/about 2/27/2013, Dr. Caperton came to the SHU and withdrew me from my cell to adminster a Correctional Management Plan (CMP).  I was physically placed in a chair, my hands cuffed behind my back, across from Dr. Caperton.  The CMP appeared to have been prepared following issuance of the incident report, as it was dated 1/24/2013, but apparently was held for implementation until a finding of guilt had been imposed.  I respectfully tried to argue the characterization of the conduct alleged in the CMP, which paralleled the accusations and were untrue, but Dr. Caperton became menacingly contemptuous, practically spitting at me that I had committed a heinous crime and that the characterization was "not open to debate."  I found it very difficult to believe the sanctions and restrictions imposed by the CMP, which included a direct order to tell everyone I knew, including elderly relatives, that I was not allowed to communicate with them or with anyone in an intimate or sexual way due to the danger I posed, and that I was also precluded from engaging in such relationships, from reading kinds of subject matter, possessing various materials irrespective of their offensiveness, writing other types of things, expressing myself in ways that could be construed as violating the CMP, etc.  I asked what these things meant and was silenced by Dr. Caperton, who said that she was there to put me on notice only.  I was advised that any violation of these supplemental rules as contrived only for and applicable only to me would result in further disciplinary action by way of a Code 326 violation (Refusing to Participate In or Accept a Work or Program Assignment).  Dr. Caperton explained that the rules in this CMP were specially designed for me and that only I was subject to them, bu t that, although participation in the Sex Offender Treatment Program (SOTP) is voluntary, if I submitted a cop-out to enroll early, it would help my case.  I thus submitted a written cop-out to Dr. Caperton immediately upon my return to the segregation cell.

28.  On 3/7/2013, I was released from the SHU to the general population at SEA, and returned directly to A5 (my assigned housing unit since arrival).

29.  On 3/14/2013, I received from Ms. V. Witcher (now Ms. V. Gee) the DHO Report. On this same day, Mr. E. Johnson, Unit Manager, called me into his office to discuss the BP-9 (#725516) I had submitted from the SHU.  He told me that I could be put back into the SHU if an investigation based on my allegations as to staff were to give rise to any reason to separate me from the staff members complained of. I told Mr. Johnson that the staff complaints were only part of the issues raised; I explained to him that, just recently, for example, on 3/7/2013, I had received "special mail" from the court opened outside my presence, in violation of policy, and that on that very day, 3/14/2013, I had again received "special mail" from my attorney, opened outside my presence, also in violation of policy.  Mr. Johnson told me that, in exchange for my writing then and there "I withdraw this complaint" on the BP-9, he would personally make sure that my mail-handling problems were resolved.  My hesitation and further questions brought a frown to his face as he repeated that I would be returned to the SHU for the duration of an investigation, and likely "shipped" to the U.S. Penitentiary in Tucson, if I maintained my complaint.  I signed the paper, and he actually praised me, obviously pleased with

- 16 -

himself, saying: "I'll even give you a copy since you were so cooperative."  I
asked what I should do next; he told me to address the Mail Room about my non-
staff-oriented complaints and to follow up with him in writing.

30.  So, on 3/14/2013 (the same day), I sent another cop-out to the Mail Room and
described the recent violations of policy, asking that the issue be resolved "per
Unit Manager Johnson."  The eventual disposition of the Mail Room being unsatis-
factory to me, I forwarded the exchange to Mr. Johnson on 3/20/2013.  He replied,
on 3/26/2013: "I will check into this.  Thank you for your email."  When the prob-
lems arose again on 5/13/2013, I wrote again to the Mail Room and then, on 5/18/2013,
to the Warden.  All of these efforts changed nothing.  Staff continued to read (and,
upon information and belief, copy and internally distribute) my mail, including legal
and special mail, in violation of 28 C.F.R. §540 et seq.

31.  On 3/29/2013, I submitted Regional Administrative Remedy Appeal ("BP-10")
#730532 as to the incident report (#2394613), DHO action, and surrounding events.
I addressed the unwarranted interference with my mail which caused my placement
in the SHU, the improper treatment as a result of my communications, the ADO in
violation of policy, failures of responsible officials to intervene or to make
appropriate decisions or otherwise discharge duties, violations of policy with
respect to the incident report, the abusive nature of the report itself, that the
charges were unsupported by evidence, that the report was fraudulent, that my right
to due process was violated by failure to allow my defense, by procedural violations,
and because even the lesser included offense of which the DHO found me guilty was
not based on the violation of any posted rule; and that these conditions adversely
affected my record, my relationships, and the rights of me and of my correspondents.
Mr. J.A. Keller, Regional Director of the South Central Regional Office (SCRO) of
the BOP, responded on/about 7/5/2013 by directing a rehearing.  I appealed this answer
as nonresponsive, repeating my claims and requesting complete expungement, via "BP-11"
to the BOP Central Office on/about 8/8/2013 (a procedural skirmish pushed receipt to
9/18/2013).  Eventually, on/about 2/4/2015 (some 1½ years later), Mr. R. Rodgers,
Acting Administrator of National Inmate Appeals, responded "for informational purposes
only," the rehearing (I believe to show me that I should better have kept my mouth
shut where other staff, as several told me, thought Mr. White had done wrong) having
by then been conducted.

32.  Aside from having appealed, the only other intervening event between the first
DHO hearing and the rehearing (held nearly 2½ months after it was directed) was that
on 9/4/2013 Ms. Melendez again accosted me in the prison law library in a manner
approximating that of her 8/1/2012 tirade (she and I had had no exchanges since that
date otherwise), renewing my fear and anxiety by fiercely telling me that she was
well aware of the disciplinary action, had "loved" knowing that I was in the SHU,
and that she and associated staff would ensure my permanent confinement through
actions just like this, which I could "take to the bank" as evidence that I would
be subject to control by her and her "friends" for the rest of my life.

33.  At the rehearing on 9/13/2013, Mr. V. Gonzales, DHO, severely abused me just
like Ms. Melendez had.  The hearing took place by remote audio/video (as contras-
ted from the hearing with Mr. White in person), and I presume it was recorded.  It
was also witnessed (and only witnessed) by Mr. Boykin as my staff representative
(he later gave me to understand that he had been constrained by his superiors not
to lift a finger for me).  Mr. Gonzales obviously took immense pleasure in verbally
mistreating me as a sex offender charged with a sexual violation.  He read a direc-
tive from the Regional Office at the outset of the hearing that indicated that he
was to ensure the presence of a staff representative and do no more for me; despite
my preparations with him in advance with respect to evidence and witness statements
and contact information, Mr. Boykin was utterly silent throughout the proceedings.
Again I was not allowed to present a defense; Mr. Gonzales, when I asked him to

call Alex and Casey, expressly refused, telling me: "They're your witnesses.
Let's see you call 'em." Obviously I, an inmate, was not allowed to pick up a
phone like that, and when I looked to Mr. Boykin for help he just stared back at
me: For all intents and purposes the rehearing was a charade, and Mr. Gonzales
was deliberately taunting me, making clear that this was not a tribunal for truth
or investigation but for execution of punishment. I had offered a written signed
statement from Alex Giovanoni, the intended recipient of the composition at issue;
Mr. Gonzales expressly refused to consider this, taking issue with the fact that
it was not notarized: When I asked for additional time to obtain a document to his
specifications (another duty of the staff representative), this was refused as well.
Mr. Gonzales did consider a memorandum obtained by staff from an alleged clinical
psychologist which simply provided the DSM definition of autism (the incident report
having alleged that Alex was autistic and in parental custody, thus objectively
victimized -- the statement I tried to present explicitly refuted such characteriz-
ation); this memo made no reference at all to Alex, nor to me, nor to the conduct
alleged; nor had I been given advance notice of its existence. Mr. Gonzales said
that by trying to rape a retarded kid through the mail I was continuing the criminal
activity which had put me in prison, and despite that I had already served sanctions
and the earlier-imposed suspended probation period six times over by that point with-
out fault, Mr. Gonzales reviewed the same conduct and re-charged me with "attempted
sexual proposal," a Code 206A violation, imposing grossly excessive and duplicative
sanctions including loss of a year's worth of good conduct time (i.e., effective
extension of the length of my prison sentence) and loss of communication privileges
for a full year, all to run from the present month, effectively resulting in the
imposition of two punishments.

34. This action violated policy, including PS 5270.09 (when a remand is directed,
the DHO is bound by the original sanctions and must run them from the date origi-
nally imposed), 28 C.F.R. §541.1 (sanctions shall not be arbitrary, capricious, or
retaliatory), directives of the Supreme Court, and the First, Fifth, and Eighth
Amendments to the U.S. Constitution, for conduct not proscribed and not as described.

35. On 9/17/2013 I was issued another incident report for having allegedly, on
9/15/2013, used the phone for high-severity (Code 297) abuse because the unit sec-
retary, Ms. Caitlin Krauss, then barely half the age of my then-girlfriend, had
actively listened to my recorded phonecall telling her I would not be able to speak
with her for a year in an effort to malign my record in a manner consistent with
Ms. Melendez's threats so as to reflect illicit proclivities toward minors (I know
this information because other staff explicitly explained the process by which this
particular report was made). The incident report stated that I was talking with a
"young female" (Mei was 32 years of age at the time). Very upset, I did prevail
upon other staff to drop the incident in recognition of its impropriety.

36. I appealed the DHO rehearing by way of another BP-10 once the DHO Report dated
10/17/2013 was issued (by which point I was already laboring under the excruciating
burden of the communications-restriction punishment) as also violative of my due
process rights where, inter alia, Mr. Gonzales had falsely wrote in the DHO Report
that Alex's family "prefers he not be contacted due to his Illness" (I still marvel
at the absurdity and the chutzpah involved in some of these machinations -- Alex's
family would have nothing at all to do with Alex as sui juris, and he was not "ill"),
had refused to call material witnesses, would not admit a written statement nor
provide opportunity to cure alleged deficiencies; where the staff representative had
failed to discharge the duties of that office (in preparation and presentation of
my defense); where the DHO relied upon an irrelevant and immaterial memorandum; and
where the entire action comprised retaliation against my exercise of my First Amen-
dment rights and abuse of a despicable person on false grounds. This is bolstered

- 18 -

by the conduct of Mr. Gonzales at the hearing, which was violently abusive and consciously violative of my rights. The effective imposition of two punishments for the same written expression, the only intervening events being my appeal and a staff warning that such would occur to my detriment, was severe as I lost contact with my friends and family and experienced extreme depression, particularly as my contacts objectively presumed that I must have merited such treatment in conjunction with the "dangerousness warnings" I was required by the CMP to broadcast. Mr. Keller's answer from the SCRO dated 12/19/2013 affirmed Mr. Gonzales's actions. I appealed same via another BP-11 on 1/17/2014, repeating that consensual correspondence cannot reasonably be anticipated to violate any posted rule; that the evidence was insufficient; that the DHO's interference with evidence, inter alia, violated my due process rights; and that the disciplinary action was arbitrary and capricious, particularly with respect to the imposition of excessive sanctions in violation of policy. I reiterated my requests for reversal and expungement. This BP-11 (#758358) was receipted at the BOP Central Office on 1/28/2014, and was not answeed until 2/4/2015 by Acting Administrator of National Inmate Appeals Mr. Rodgers, at which time my appeal was denied.

37. Finally, some two years after the incident, on 11/24/2014 the CMP was lifted, seemingly signaling a new era in my treatment by prison staff.

38. On or about 12/16/2014, I filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. §2241 in the U.S. District Court for the Northern District of Texas at Dallas, No. 3:14-cv-4402-D-BK, respecting the loss of good conduct time occasioned by the disciplinary proceedings and due process violations related to incident report #2394613. I requested reversal, expungement of related documents, and restoration of lost time and privileges, alleging improper manipulation of my record by BOP staff and retaliation for the exercise of my First Amendment rights both in the writing of the composition and in appealing the disciplinary actions.

39. My request for a "nearer-release transfer" to a facility closer to family (I had not seen my mother since 2009, and I could never receive a visit while confined so far from the NYC area in Texas) was granted, and I was "shipped" via Federal Transfer Center Oklahoma City (OKL) to FCI Fort Dix (FTD) in late February and early March of 2015.

40. In April of 2015, I learned, from a document filed under seal on 3/30/2015 in the aforementioned habeas action, that as a direct result of my filing the BOP's National Discipline Hearing Administrator had directed the Discipline Hearing Administrator of the SCRO to expunge the incident and restore all of my good conduct time, which action was executed on 3/23/2015.

41. Although the restoration of the good conduct time, according to the habeas respondent (initially Warden Mejia, later Warden Hollingsworth, but at all times represented by AUSA Angie L. Henson of the U.S. Attorney's Office for the Northern District of Texas), mooted the case under §2241, the CMP and related records as constructed by staff in the course of the illegitimate proceedings of 2012-2013 remained in my file, reflecting that incorrect allegation built up in deliberate ignorance of the truth and in avoidance of available material facts. Accordingly, via the habeas case, I persisted in arguing that the court should order full expungement of any and all portions of my prison record reflecting the alleged bad act or any characterization of the incident as based on a view unsupported by and incompatible with the true facts, because references thereto are (as subsequently conceded by the habeas respondent) used for imposition of restrictions, affect my treatment by prison staff generally, and are intended for use against me in future civil commitment proceedings.

42. On the evening of 5/25/2015, I placed several envelopes in the prison mail system at FTD for anticipated processing by the U.S. Postal Service on the morning of 5/26/2015, including one letter addressed to my mother and one letter addressed

to my then-fiancee. At the time, she was aged 33 and I 35, and we were in a committed, intimate, marriage-bound relationship. By the end of May, my mother had informed me that the envelope I had sent to her on that day had arrived opened and re-sealed. My fiancee, Mei, however, continued to advise me that she had not received the envelope I had sent on that date. The envelope had contained communications of the type from which the CMP in effect from 2013-2014 at SEA would have precluded me (and which a new CMP in effect presently precludes me even from fully describing in this complaint). They comprised an important part of our relationship, which had progressed to a stage in which my fiancee was frequently expressing her intimate needs and thoughts to me, in a responsible manner of sharing (as opposed to, as previously, using less-healthy outlets for her private interests), and asking for my input and engagement, to explore the overlaps and limits of our private experiences. I was not subject to a CMP at the time, and no posted rule proscribed such communications, which were not only consensual but integral to the natural development of our bond toward our shared and committed objective of lifelong cohabitation, service of each other, and genuine intimate trust. Because such interference with my mail as evidenced by this delay or apparent loss violated policy, I initiated the Administrative Remedy process, starting with a cop-out addressed to the Case Management Coordinator (CMC) at FTD, dated 6/8/2015, raising my contention that "my outgoing mail is being tampered with in violation of PS 5265.14," referencing the letters sent on 5/25-5/26/2015, and citing 28 C.F.R. §540.14(c)(1). Having received no response to that inquiry, on 6/30/2015 I proceeded to the next step in the process, a BP-8, repeating the issue to Ms. R. Roberts, my assigned Counselor. Her reaction indicated awareness of "problems with Psychology" as to my specific case (Psychology is the department in BOP facilities which handles sex offender and CMP-related issues).

43.  On 7/1/2015, more than 35 days after I had sent the letter to my fiancee, I reported to a call-out at Psychology and met with Dr. Stacie Marantz, who told me that the letter had been intercepted and withheld because of its sexually-explicit intimate wording. She advised that all of my mail was being monitored, basing the legitimacy thereof upon the CMP which had been terminated on 11/24/2014 and upon the conduct described therein, i.e., the correspondence with Alex which had since been refuted and expunged through the habeas action. Dr. Marantz's verbal recitation of said incident mirrored, to my recollection, the biased language of the DHO (i.e., sans contribution from either party to the exchange). To my statement that the intended recipient of the letter at issue -- my fiancee, Mei -- was an adult with whom I was in a long-term committed relationship, Dr. Marantz responded: "We don't know that." She declined my offer of evidence of the innocuous context of the communications and of the mischaracterization of the "Alex" incident, on the ground that this particular incident was not going to result in any adverse action. To my assertion that the 2012 incident should have been expunged along with related documents on or about 3/23/2015, and that the CMP had been lifted even prior to the expungement, Dr. Marantz confirmed the latter fact but insisted that the contested information was in fact represented in my file for viewing by staff and that it formed the basis for the instant concern. Dr. Marantz stated (and written records in "PDS," the Psychology Data System, also show) that it had been determined that I would be afforded a verbal "warning" at this time in response to my letter with Mei, but she also instructed me to avoid further "risk-relevant behavior" in order to avoid adverse consequences. I asked Dr. Marantz for a definition of "risk-relevant behavior" (RRB) as applicable to me, which she was unable to immediately provide; however, according to the afore-cited policy definition, I did not and do not believe that I have ever engaged in RRB, and I disputed that characterization of my private communications with Mei as completely irrelevant to future commission of child sex offenses and in fact quite the opposite given the rehabilitative nature of a caring, constant, committed relationship.

44.  As I later discovered, the very next day, on 7/2/2015, Ms. Caroline Gary, LMSW, authored an entry in my PDS file containing falsehoods (e.g., that I "was previously housed at a SOMP [Sex Offender Management Program facility] (SEA) for a CMP due to sending out sexually explicit and pornographic mail") and stating: "As a result of this inmate's recent risk-relevant behavior it was determined that he should be returned to a SOMP for specialized CMP.  The rationale for referral to a SOMP/CMP involve the inmate's PSI description of his efforts to persuade a female accomplice to assist him in an escape attempt; his original offense involved internet correspondence with two parties; his first CMP also dealt with sexual communication with the general public; and he currently wants to engage in sexual communication with his fiance [sic] -- all of which reflects a pattern.  A CMP is suggested to monitor his communication with the general public, and to set limits that can be appropriately monitored."

45.  On Monday, Tuesday, and Wednesday, 7/6, 7/7, and 7/8/2015, I attempted to utilize established "special mail" procedures at FTD to file a supplement to the pending habeas action based on the events surrounding 7/1/2015 to show continuing collateral consequences of the incompletely-expunged records.  Policy #FTD5265.14D requires that such mailings "be hand-delivered by the inmate to a unit staff during open house"; PS 5800.16 states: "Inmates will deliver their own outgoing special or legal mail directly to a staff member, normally a member of the unit team or correctional systems staff."  No "open house" hours being posted in Unit 5B12 where I was then housed, and staff offices generally being closed at the times that they would be accessible to me (i.e., when I was not working as a tutor for inmates with learning disabilities 7:30-3:30 Monday-Friday), I was unable to reach any "unit staff" located in Unit 5B12 over those three days.  Additionally, throughout this period my inbound legal mail which qualified as "special mail" was consistently mishandled by Three Doe (true name unknown) who worked in the Mail Room, i.e., it was opened outside my presence, read, presumably copied and disseminated, and only delivered to me via regular unit mail call.

46.  On 7/7/2015, I reported to another call-out with Dr. Marantz, who expressed sympathy that she bore bad news, in the form of an arbitrary change: from the BOP Central Office (apparently, she said, this was specifically determined by Dr. Bickart), retracting the warning and replacing it with an order that I be immediately transferred back to SEA for imposition of a "specialized CMP" and severe restriction of my communications with members of the public.  Dr. Marantz said that she would not have seen the situation as requiring such a harsh response but that the decision was not hers to make.  I asked how to appeal the decision, given that my communications, initially meriting a warning, had not violated any posted rule, did not meet the definition of RRB, and that the action was based at least in substantial part upon a flawed determination which should have been expunged; Dr. Marantz, as appointed Chief Psychologist at FTD, stated that she would look into it for me.

47.  On 7/8/2015, I sought clarification and assistance from my assigned Case Manager, Ms. A. Crisson, by submitting to her a cop-out to which she responded in writing on 7/13/2015 that: "On 7/6/2015, Unit Team was notified to initiate a transfer request back to a SOMP for a CMP."  She told me that this "409" transfer order was en route to the Warden's office for execution (pending foregone approval), projecting that it would result in physical transfer "within a few weeks."  Ms. Crisson also opined, having read the letter between me and Mei, that such exchanges between inmates and their intimate partners were commonplace and that she could not "see what the problem" was; she advised that this transfer was out of her hands and that she had never before seen a case where staff outside the institution had initiated a transfer like this -- and that, based on the nature of this experience, she hoped never to have to deal with something like it again.

- 21 -

48.  On Thursday, 7/9/2015, with permission from Education staff (my direct work supervisor, Mr. Volpini, gave his authorization for "legal purposes"), I left my tutoring position early but again found staff offices in Unit 5812 closed.  Having overheard my complaints, another inmate, who also had outgoing special mail to send, informed me that Mr. H. Thompson, a member of "unit staff" in Unit 5802 (an identical building in the same physical area), was conducting "open house" there from 3:00-4:00pm.  Believing, based on policy and common knowledge, that he and I could approach unit staff for this purpose during open house, despite that we both were housed in different units (he in Unit 5841 -- all three of these buildings, 5802, 5812, and 5841, housed some 370 inmates each as well as a corridor adjacent to the entrance containing the offices of unit staff), we both walked directly to Mr. Thompson's staff office and got in line with the several inmates waiting on him.

49.  All inmates in front of me, including the one with whom I had approached, were processed by Mr. Thompson; that is, he accepted their special mail (in the cases in which that comprised the inmates' business, as it did with the inmate accompanying me) regardless of their assigned housing unit.  But Mr. Thompson treated me differently, and upon information and belief this was as a result of directives, e.g., from the BOP Central Office and disseminated locally amongst staff, in retaliation for and in suppression of my §2241 filing, related submissions, and complaints; as well as a result of his reviewing my prison record, including the supposedly-lifted CMP and supposedly-expunged rendition of the "Alex" incident (PS 5324.10 states that the CMP "is a non-clinical document, and is disseminated to staff in other departments"; PS 5510.13 states that "unit staff review [inmates on a 'hot list'] at least monthly"; other staff have personally told me that my file must be reviewed on a basis as frequent as weekly and that a special file is posted on their intranet portal for this purpose; such staff have candidly explained to me the blatantly malicious nature of the information contained therein, telling me that "somebody has definitely got something against you" and describing confidential details of my file to me in a friendly or jokey manner).  Mr. Thompson refused to accept my legal mail for the U.S. Distict Court for the Northern District of Texas at Dallas and for service to the U.S. Attorney, despite that PS 5270.09 defines "Inmate Right #6" as "the right to unrestricted and confiential access to the courts by correspondence."  He contacted Ms. Roberts (my assigned Counselor) by telephone and directed me to return to Unit 5812 to see her.

50.  Back at Unit 5812, I waited by the locked door to the unit staff corridor, and within minutes Ms. Roberts came from within to unlock it.  She took my special mail and locked the door behind her again.  This special mail, to my knowledge, was never processed: It was never docketed by the District Court, and if the U.S. Attorney's Office received its copy, it did not advise as to any discrepancy. Thus my First Amendment right of access to the courts was violated.

51.  Mr. Thompson wrote, minutes after I left his office, an incident report (#2736340) issued to me on 7/10/2015 charging me with "being in an unauthorized area."  At the time of issuance I contended that, while the conduct described in the incident report as to my approach of staff did occur, it was innocuous and allowed, and that the report was therefore not in good faith.  I also pointed out that such a disciplinary action would in itself be violative of my rights as repressing and chilling my ability to express my grievances and petition the courts.  I prepared and submitted statements and evidence to assert and defend my rights with respect to due process, which items included the averments of two inmates (including the one who, while similarly-situated to me, had been treated differently by Mr. Thompson moments before me, and one who, by virtue of his also residing in Unit 5812 and frequently handling legal matters, knew of the reality

- 22 -

of inmate access to such resources with respect to applicable policy) in order to show that the conduct was ordinary and common and allowed for others, and to support my position that I had had no choice, given the unavailability of any other staff, but to approach Mr. Thompson -- where he was conducting "open house" in a common area accessible to inmates for that purpose -- in order to execute my legal petition so that it would be available for consideration by the courts.

52. The UDC hearing as to this "Code 316" violation was held on Wednesday, 7/15/2015, at which hearing (chaired by Ms. Crisson and her colleague, a Counselor, Ms. R. Rudnitsky) I attempted to present a packet containing inmate statements and policy citations, as well as my declaration, and to request the calling of witnesses, including those inmates who had seen the closure and inaccessibility of staff offices in Unit 5B12 and who had performed the same action as I had without issue, who had witnessed my repeated attempts to conduct my legal business and could speak as to ordinary procedures and policy, as well as to seek the appointment of a staff representative as afforded by PS 5270.09 to ensure the preservation of my general procedural rights as enumerated in 28 C.F.R. §541.7 subsections (d) and (e). I also asked whether the incident could be heard by a DHO rather than associated unit staff to ensure that the proceedings were free of bias. All of my requests were flatly denied; the UDC declined (through its spokesperson, Ms. Crisson) to receive my papers or to do anything on my behalf toward enabling exercise of my rights at the hearing. Ms. Crisson, due to the events of 7/6/2015 through 7/13/2015 recounted supra, was, upon information and belief, predisposed against me and I also believe, based upon surrounding events such as occurred with Mr. Thompson and Ms. Roberts, as well as the manner in which Dr. Marantz's original decision had been reversed, that the UDC was operating under instructions (much as I had experienced with Mr. White in the past and in future situations, recounted infra). The UDC summarily found me guilty of the offense, added the violation to my prison record (increasing my security level and affecting future considerations including transfers -- PS 5100.08 requires that inmates not be granted "nearer-release" transfers for 18 months following their last disciplinary action, thus by this action FTD staff were ensuring that I could not return easily once removed from their caseload -- and disciplinary sanctions where frequency of accumulated incidents increase available punishments), and additionally restricted my privileges (e.g., Commissary) for 30 days. Thus my rights under the First and Fifth Amendments were further violated in retaliation for exercise of my rights of expression and access to the courts where the cited "Code 316" violation ("Being in an Unauthorized Area") was void for vagueness as applied to my conduct as well as unsound and my procedural rights were not respected, as derived from the aforecited impetuses for retaliation; my rights under the First Amendment were thereby also subjected to a chilling effect.

53. Between 7/15/2015 and 7/22/2015, I engaged in an electronic exchange with Dr. Marantz using the Inmate Request to Staff function on the proprietary computer terminals made available to federal prisoners, seeking information and records related to the decision to transfer me (which decision she had previously advised had been made by Central Office staff member Dr. Bickart in overriding the previous determination to afford only a "warning" in response to my attempted interaction with my then-fiancee, Mei). I explained to Dr. Marantz that, according to PS 5324.10, she was the designated official with authority to evaluate institution behavior and make any resultant decisions. I explained that the policy required an "initial risk assessment" conducted at a "screening interview" which was "documented on PDS" to include "an explanation of risk-relevant behaviors that may warrant a CMP," a "non-clinical" document. I explained that, according to the same policy, this "initial risk assessment" is "used to guide treatment and management decisions," and I recited the policy definition of "risk-relevant

- 23 -

behavior" (RRB) verbatim, i.e.: "Institution behavior related to a sexual offen-
der's history that indicates risk of future sexual offending upon release (e.g.
an inmate convicted of child pornography who collects pictures of children; a
sex offender who attempts to contact potential child victims)."

54. Notably, as I explained to Dr. Marantz, RRB is apparently supposed to reflect
a risk of the commission of a future criminal sex offense. The examples of RRB
cited in the policy definition are completely different from the conduct and cir-
cumstances of the incident alleged to have been the basis for transferring me
and imposing grievous restrictions on my civil liberties beyond those part and
parcel to ordinary prison experiences. According to the 7/2/2015 PDS entry by
Ms. Gary, as I recounted it to Dr. Marantz in this exchange, the "rationale for
referral" relied in part on the "first CMP" and described the instant RRB as:
"he currently wants to engage in sexual communication with his fiance [sic]."
Thus, as I explained to Dr. Marantz, it appeared that the nature and character-
istics of my relationship with Mei, insofar as such involved a shared sexual
aspect, was mischaracterized; based on Dr. Marantz's comment ("We don't know
that") at our 7/1/2015 meeting in response to my assertion that Mei was not a
child, I surmised that staff suspected (or deliberately intimated, i.e., in order
to enact the retaliatory motive threading through Ms. Melendez's 8/1/2012 threat,
the manipulation of my PDS records including by Ms. Lasseter on 5/16/2012, the
interference with my communications and relationships passim, the token ADO signed
by Lt. Gentry in association with my segregation on/about 12/11/2012, the fraud-
ulent assertions of Lts. Shannon and Stallings surrounding the inflammatory report
of Mr. Rogers on 1/8/2013, the conclusions of Mr. White and Mr. Gonzales, on
2/26/2013 and 9/13/2013 respectively, which latter action was further retaliatory
of my having filed complaints as to the former, the imposition by Dr. Caperton
of gross restrictions upon my expressions, communications, receipt and issuance
of information, access to resources, relationships, etc., on 1/24/2013-2/27/2013,
the affirmations of these violations by supervisory staff, the attempted further-
ance of such manipulations including on/about 9/15/2013-9/17/2013, and the recent
abuses surrounding my early-July efforts to obtain judicial review of the instant
matters) that Mei was a minor or that our relationship was somehow illicit.

55. Because, as I continued to submit to Dr. Marantz, she was -- according to the
relevant policy, the official with whom the decision to transfer me for placement
on a second "specialized CMP" rested, I implored her to examine the facts, to
apply some form of procedural safeguard as might be supported by regulations, in
consideration of the infringement of not just my rights but upon the relations I
had with Mei, with my mother, and with friends, family, and supporters. In par-
ticular, I explained to Dr. Marantz that I had had no visits at all throughout
my imprisonment in federal facilities, last having seen my mother and ex-girl-
friend in 2009 through glass at an east-coast county jail, until arrival at FTD,
finally within visiting radius of all of these people as well as my life-long
primary care physician, Dr. Martin Riss of Brick, NJ. Although I had seen my
paternal aunt once and my mother some half-dozen times since my arrival there,
I had yet to see my brother, other family members, and friends and former pro-
fessional associates since 2008. I explained that these connections were inval-
uable to me (particularly because my brother's telephone does not work with the
prison's systems and he, like many people of the younger generation, simply does
not interact with others but in person or electronically) and that they were of
immeasurable rehabilitative power. I pointed out that the intimate communication
with Mei was within the scope and context of a healthy relationship which would
tend to diminish to the point of vanishing any risk of re-offense in my case where
it involved commitment to a monogamous and permanent relationship with a success-
ful and wonderful woman who loved me and who saw my inherent humanity (unlike

what was happening to me in prison). I explained my belief that virtually all relationships between a man and a woman involve an aspect of sexuality, if they are normal and healthy, and that this aspect is a private and crucial component of a couple's life together; I further explained that, since my communication to Mei was in response to her requests and attempts to engage me in that manner, that is, that she needed me to fulfill that part of her person as well as other intimate aspects, and that all of this was a productive part of the normal course of growing closer together, forging trust, establishing roles and supporting each other, defining the contours of our future life together, and even learning about the non-public parts of each other so that we could discover whether such a commitment is sustainable, requires certain compromises or concessions, or must be jettisoned. I asked Dr. Marantz to exercise her discretion based on the true facts and not in knee-jerk obeisance to Dr. Bickart's and the BOP Central Office's directive which technically was not in accordance with policy respecting RRB, and I repeated that my mail should not have been interfered with in the first place.

56. On 7/6/2015, upon my breaking the news to her on the telephone as to the decision to transfer me away from my family because of a communication I had sent as part of our intimate exchange in keeping with that private aspect of our relationship, my then-fiancee Mei cried in despair: "This life is not worth living!" That exclamation broke my heart. I had known already that the work of BOP staff in response to that letter was harmful, but I was stunned by how hard Mei took it with respect to the implications and effects upon our actual life together (as distinguished from issues of physical visitation or punishment, i.e., the way the retaliatory action hurt us and our relationship). From that instant forward, Mei became more and more emotionally distraught. She lost trust in me, in part because the prohibitions of the prison on my ability to connect with another person in a meaningful way, at least insofar as respected the trajectory that Mei and I had been on and her need for me to fulfill a specific role in her life as her husband-to-be, indicated to her that I was, at least according to some authorities, not fit for (or even wrong for) such a human capacity. Our bond crumbled over the following months; the actions of staff had and continued to corrode the trust and intimacy we had been building over years in our private relationship. Mei never received that letter, and staff refused to return it to me, despite that they also failed to provide a confiscation form as required by policy. Within a few months, the engagement was called off and, by New Year's 2017, she disavowed completely any possibility of further romantic involvement with me, all as a direct result of the events of 7/1-7/2/2015; I found myself in tumultuous positions, because we still love each other, and because I care for her, wherein I have to support her efforts to find an outlet for her desires of the same type she once shared with me, but now for other men -- because BOP staff expressly forbade me such fulfillment.

57. I believe that violations of policy and neglect of due process were inherent to the harmful actions which brought about that result; that the adverse outcome as to our relationship would not have derived from proper adherence to the law; that staff improperly relied on materials such as the false record in the "Alex" incident and worked to harm me by interference with my communications and relationships on grounds evinced by their treatment of me including the 2012 threat. I believe that, particularly as the records and determinations supporting the malicious actions against me are factually misrepresentative, they have been deliberately contrived with the intent that harm such as this (as well as future harms) should come to me. I also believe that the decision embodied by Ms. Gary's PDS entry on 7/2/2015 was improperly usurped from Dr. Marantz by Dr. Bickart, et al., in retaliation for the exercises of my First Amendment rights both in writing the materials at issue and for my effectively successful filing under §2241, etc., and that at the root of all of this lay improper arbitrary intercep-

tion of my private correspondence and interference with my personal relation-
ships contrary to established policy and law.

58. On 7/11/2015 my mother wrote a letter, and on 7/13/2015 my then-fiancee did
likewise, in support of her 7/10/2015 affidavit (signed and notarized), which I
submitted to the U.S. District Court for the Northern District of Texas at Dallas
in conjunction with a request for injunctive relief and/or as an objection to
dismissal of the habeas action as moot. These documents expressed the authors'
emotional pleas that I not be transferred away from family as a result of an
indiscretion in private intimate correspondence with my fiancee; they also vouched
for the character of our mutual relationship as well as sought to show the genuine
and innocuous nature thereof. My mother in particular wrote that she was "heart-
broken." I asked the Court to recognize that these events stemmed in substantial
part from the disciplinary incident that formed the basis of the habeas action and
thus that the respondent's "expungement" had been ineffectual.

59. On or about 7/13/2015, I received a response from Ms. Roberts as to the BP-8
I had initiated on 6/30/2015 with respect to the interference with my mail to Mei,
which response I construed as utterly non-responsive. Accordingly, on 7/21/2015,
I obtained a BP-9 from her which I submitted on 7/24/2015 in order to prompt admin-
istrative action as to my complaint that my outgoing mail was consistently tampered
with in violation of PS 5265.14 and 28 C.F.R. §540.14(c)(1). On or about 8/18/2015
Warden Jordan Hollingsworth answered this BP-9 (Administrative Remedy Request
#830996) and wrote: "Based on the nature of your crime, staff may, in accordance
with [PS] 5265.14 ... and 28 C.F.R. §540.14, open and inspect your outgoing mail,"
denying my request for relief. But the sections which he cited did not support
his conclusion; therefore, I appealed to the Northeast Regional Office (NERO)
seeking "the specific reason and authorizing policy for the ongoing ... arbitrary
opening of outgoing mail and the withholding of contents from intended recipients
without allowance for due process of law." In a complete reversal from the ear-
lier explanation of Mr. Hollingsworth, Mr. J.L. Norwood, Regional Director at NERO,
on or about 9/29/2015 acknowledged by way of his denial of my appeal the rule that
my outgoing correspondence cannot ordinarily be opened except "if there is reason
to believe it would interfere with the orderly running of the institution, would
be threatening to the recipient, or would facilitate criminal activity," stating
that "staff determined specific letters sent by you required further inspection
due to security concerns." My issue, as stated, was never that a particular
letter could give rise to such "probable cause," but that all of my mail was
always treated that way, and that the letters which had been used to promote
adverse action against me had not met any of the criteria conceded by Mr. Norwood
to be necessary for such "inspection due to security concerns," without such
attenuated suspicion, and thereafter mishandled as staff saw fit, including not
just with disciplinary actions, record manipulations, and transfer referrals
and imposition of restrictions, but by withholding, censorship, and destruction
of contents intended for free persons with whom I maintained personal relations.
In spite of all of this, Mr. Norwood concluded that "[t]here is no evidence in-
dicating that staff improperly exercised their discretion in processing your
outgoing mail." These denials were appealed by me to the BOP Central Office on
or about 10/8/2015 (and resubmitted in response to a procedural rejection on or
about 12/12/2015), with no response to date as to my Fourth Amendment claims.

60. On 7/31/2015, I wrote to Mr. Delbert G. Sauers, Chief, Designation and Sen-
tence Computation Center (DSCC), to report that the "rationale for referral"
involved in the pending redesignation request before his office for approval
was invalid and improper, specifically explaining the aforementioned relevant facts
and attaching the notarized affidavit of my fiancee at the time, all to no effect.

61. On 8/4/2015, via Ms. Roberts (after days of trying to do so via Ms. Crisson, who variously told me that I could not, or that the time limit had expired, or flat-out refused to give me the necessary paperwork), I submitted a BP-9 appealing the 7/15/2015 UDC action respecting the 7/9/2015 incident report of my attempt to utilize special mail procedures. This appeal was subsequently assigned #830882 and, following two more procedural skirmishes at the institution level, denied on/about 9/1/2015 by Mr. Hollingsworth (through Ms. Crisson; that is, she prepared it for his signature) and, on/about 10/30/2015, the denial affirmed by Mr. J.A. Keller (Regional Director at the South Central Regional Office (SCRO)). These denials I then appealed to the Central Office on/about 11/19/2015 (and resubmitted, due to yet another procedural rejection, on/about 12/29/2015), and I remain awaiting a response thereto.

62. Also on 8/4/2015, I submitted to Ms. Roberts a BP-8 seeking intervention to halt the impending transfer. Her token response dated 8/10/2015 led to my obtaining, on 8/11/2015, and submitting, on 8/17/2015, a BP-9 (#832539) requesting that the transfer request (a "Form 409") submitted by Ms. Crisson to DSCC on 7/24/2015 for a "Code 324 transfer" be withdrawn and cancelled. In support, I raised the grounds that the action violated my First Amendment rights to freedom of expression and to intimate association where it restricted and retaliated against correspondence with my then-fiancee without being narrowly curtailed to a valid penological interest; that the concomitant opening, reading, and censorship of my mail sans due process, in conjunction with the lack of reasonable nexus to the definition of RRB so as to enable avoidance of adverse consequences, violated my Fifth Amendment right to due process of law and under the circumstances was pretextual for retaliation; that my Eighth Amendment rights were also implicated by these manipulations of my record for the malicious purpose of promoting the extension of my confinement, along with the distress caused me and my relations, and that the transfer would remove me from my family and doctor, all in the NYC metro area (attaching a note from my physician regarding the arrangement of a medical examination); that the CMP comprising a substantial part of the "rationale" for the transfer was based upon false information and should have been expunged, and that its use in this manner constitutes further infringement of my rights; and that the "rationale" and related determination were arbitrary, capricious, and did not comport with policy especially as the letter to my then-fiancee, as described by Ms. Gary's PDS entry on 7/2/2015, categorically does not meet the RRB definition -- referral for transfer or imposition of a CMP, as promulgated at PS 5324.10, requires (by mandatory language) that the conduct meet said definition -- in other words, that the decision was made for reasons which did not rely upon a factual inquiry, was retaliatory, and was persecutive. Mr. Hollingsworth's response, dated 8/28/2015, stated that the written "contents of the letter qualify as [RRB]" under PS 5324.10, Chapter 4.2 of which, he claimed, authorized the (by-then-completed) redesignation, denying my request. From SEA, on or about 11/9/2015, I appealed the denial to the SCRO, explaining the delay as attributable primarily to the transfer, and exercising due diligence.   I maintained that, contrary to Mr. Hollingsworth's assertion, the policy definition of RRB was not implicated as alleged and that my private correspondence should not have been opened in the first place. This appeal was rejected on or about 11/19/2015 by the Acting Administrative Remedy Coordinator at the SCRO, Mr. Boddy, who wrote: "Your appeal is untimely .... You had 20 days from the Warden's signature 08-28-15 [including mail time] .... You provided no valid staff documentation for reason of delay." Immediately upon receipt of the rejection notice, on 12/12/2015, I responded thereto, resubmitting the same papers, "disput[ing] that a staff signature should be required to establish a valid reason for the delay in my submission" when "my physical transfer" was "a fact which can be

verified via SENTRY," the computer system tracking all such inmate data, and pointing out that the "delay in receipt of property" could "only be demonstrated by omission, in that no such record would exist" -- but I did attach to that response "a copy of the property form," signed by staff, showing dates associated with the transport of my legal materials, which was the material reason for the delay as I could not act while separated therefrom, and averred that staff had otherwise refused to confirm the "mishandling of mail by staff" but, maintaining that this should not be cause for procedural default, enclosed related evidence from my mother. I explained that "I am unable to compel staff to produce evidence [or] to perform any act on my behalf especially when the request is to produce documentation which rationally should already be available to the staff for whom I am supposedly requesting it," asking the Administrative Remedy Coordinator to "[p]lease process my appeal." Eventually, on or about 4/25/2016 , I appealed the lack of a response, construed as a denial, to the BOP Central Office, with no response to date.

63.  Upon my return to SEA in September of 2015, I was informed by Dr. Caperton that the decision to transfer me for imposition of a new CMP (which she sub-sequently imposed on or about 10/7/2015) had been made by Dr. Bickart in the BOP Central Office; thus on 9/29/2015 was corroborated Dr. Marantz's explanation.

64.  Having been processed by Receiving & Discharge on 9/24/2015, I was not placed in Unit A5 where I had previously been housed from 2011 through 2015 before my transfer to FTD (and in spite of the fact that it is common practice for inmates who had left the institution for whatever reason to be returned to their formerly assigned housing unit, if only for continuity of "unit team" oversight by staff), but in Unit E6, where a markedly higher proportion of inmates known for physical sexually-predatory behavior, including several who had a history of having accos-ted me, were housed. I promptly sought protection from available staff and was advised to calm down and make my request to move units through ordinary channels, as I admittedly was not in imminent danger. I began by speaking with relevant staff including "unit team" in A5 so as to ascertain the prevailing procedure, then sent, as instructed, an electronic request to Mr. Mike Morris, Unit Manager, that I was subject in E6 to unwanted sexual harassment and requesting to move back to A5. He flatly denied my request in writing but verbally advised that I work with "unit team" in A5 to identify an inmate in that building with whom to "swap" so as not to upset the balance of staff members' caseloads. Mr. Gibbs, Case Manager in A5, and Mr. Pate, Unit Manager over A5, agreed by 10/30/2015 to a specific swap, which was approved in writing on behalf of E6 "unit team" by Mr. Ajo, my assigned Case Manager, on 11/4/2015: "Unit Team is OK with switch. Will initiate by 11/13/15." However, the identified inmate, who was new to SEA, changed his mind about a swap. [Here some explanatory background is in order: SEA, being a SOMP facility and a destination for inmates requiring protective custody or other consideration, also has been designated as a specialized facility for the housing of certain demographics of prisoners with respect to their sexual or gender identities. The ratio of openly homosexual inmates at SEA to their heterosexual counterparts is dramatically high; likewise, SEA houses a sizable contingent of transsexual inmates. Inmates selected on bases other than "protected classes," i.e., who are heterosexual and identify as male, yet are housed at SEA, are for safety reasons at least minimally tolerant of such alternative lifestyles. Thus SEA generally operates pursuant to an order recognizably more relaxed than other facilities, with particular respect to sexual activities amongst inmates. Ordinarily, and in accord with the declared objectives of the Prison Rape Elimination Act (PREA), federal prisons are to have "zero tolerance" for any sexual conduct, to include masturbation and even non-forcible sex (all prohibited in PS 5270.09), and generally inmates cannot "consent" under these

circumstances. But at SEA, romantic and sexual relationships between inmates are as public as/more public than would usually be seen in the free community. Homosexual inmates engage in sexual conduct with impunity so long as they keep it primarily out of the sight of staff who would discriminate against them; SEA also employs a higher apparent percentage of openly homosexual staff than the average federal prison, and homosexual inmates at SEA enjoy delegated authority over a broad array of inmate-operated privileges and resources due to the higher incidence of staff affinity for their characteristics. These comments, I recognize, may sound biased; to the contrary, I am open-minded, quite literally, to a fault, and take no issue with any brand of sexuality that does no harm and is consensual. These facts are easily verified through any reasonable cross-section of staff or inmates at SEA. This being said, I find that "doing time" as a heterosexual male in prison is of a completely different animal than, based on my observations, the same "time" would be for an openly homosexual male, or transsexual female, at SEA, because those inmates tend to partake in all of the trimmings of normal life and are effectively only limited by the physical boundaries of the prison: They enjoy flirtation, love, romance, sex, and all the trappings of everything in between, for good and for bad, which is, and which boils down to, life. I don't get to live that life. So when I am serving a 17-year prison term, and a gay guy gets the same amount of time but is able to share it with a partner, able to share everything with that partner, I feel that I am deprived of something unduly.] The inmate identified for the swap to rescue me from unwanted sexual harassment and battery in E6 turned out to be gay, and found a lover in A5, and wanted to stay with him. So he backed out of the agreement, and was replaced with another. This revised swap was also approved by Mr. Ajo, again in writing, on a cop-out which specifically referenced my need to escape "unwanted sexual advances," on 12/4/2015.

65. Throughout this period, i.e., in September, October, November, and December of 2015, I was repeatedly accosted by homosexual inmates in E6. I was propositioned (e.g., told to meet in the showers for sexual activity at night) and groped (e.g., high on my thigh near my crotch) and pressed against bodily in a forcible and sexual way. Also during this period I witnessed, and many observant inmates would corroborate same, numerous inmates move from building to building (or, as in the case of my intended "swapper," choose to stay) at will for the express purpose of being near a preferred partner.

66. Although the second swapper was moved from A5 to E6 on 12/4/2015, I was still not moved. While I maintained deference to Mr. Morris's excuses, they had grown more implausible, and I submitted an electronic request to staff the same day to memorialize his claim that, despite the obvious vacancy half of a "swap" would make, an overflow in another unit (B53, where some inmates were as a result assigned to cots rather than bunks) prevented my moving to the swapper's empty bunk. Mr. Morris continued to suggest that I revisit the issue with him, as he had said the preceding week, the following week.

67. On 12/8/2015 I did so, and went out of my way to remind Mr. Morris, verbally and in writing, that I was "having an increasingly hard time in E6 with inappropriate and undesired attention from other inmates," at which time he abruptly stopped stringing me along and wrote: "Your request is denied. You are not authorized to move from E Unit at this time." Interpreting "at this time" within the context of the process thus far to be another temporary delay (and effectively unwilling to believe that he would do that under the circumstances, i.e., choose to force me to be subjected to further abuse), I approached Ms. Barroso (Counselor in A5 Unit) on 12/11/2015; she confirmed the availability (subject to Mr. Morris's authority) of nine (9) bunks open in A5.

68.  I repeated my request to Mr. Morris with that current information, and was again denied by him on 12/15/2015.  I appealed the same day, mailing a BP-9 to the Warden, but it was rejected as having eschewed the prerequisite BP-8.  On 12/16/2015 one of the homosexual aggressors in E6 grabbed and groped at my CENSORED (through my pants but with his bare hand) and pressed his body to mine against my will and in a disgus-tingly sexual manner, all in the presence of witnesses.  [Portions of this document are censored to ensure compliance with the CMP under which I am compelled to operate.]  I pushed him off and away from me, hit him, and yelled a loud stream of profanities, telling him never to touch me and to leave me alone, which was there-after largely effective, limiting my problems for a time to revulsion, distress, and related sleep deprivation as a function of our proximity and frequent interactions with him and other aggressors living in E6 who continued to harass me inappropriately.

69.  On 4/22/2016, I re-raised my request to move to A5 with Mr. Ajo, these things having again risen to an intolerable level; he told me that, while ordinarily such requests were handled without involvement of Mr. Morris, since in this case Mr. Morris had taken an inordinate interest, I should approach him again.  (At all times rele-vant, when Mr. Morris and I would cross paths, if any interaction occurred he would usually slight me in the company of his colleagues or send me on fool's errands just for derisive entertainment.)  I wrote to Mr. Morris, explaining again that I "con-tinue to experience distress in E6 due in large part to inappropriate attention from other inmates ... [E6] affords no refuge from harassment ... [this] issue does not exist in A5 ... I just want to be able to do the remaining eight years of my sentence free of this type of problem."  Mr. Morris denied this request on 4/25/2016.

70.  On 5/26/2016, I complained to Mr. Morris in writing of having been moved again within E6, the fourth time in eight months, never at my request, this time even closer to the inmate who had previously assaulted and harassed me.  Such moves, save for those necessary or exceedingly occasional, are on a basic, essential level dis-ruptive.  They are physically grueling (picking up all of my property and bedding, weighing hundreds of pounds, and moving everything up and down stairs and across long distances through obstacles, resulted in months-long serious pains in my hand, wrist, and arm), demeaning (observing inmates impeded passage and proclaimed that I must be deserving of such obvious mistreatment), and exhausting (I felt, over time, that I was never abl bto settle down and settle in to "do my time" in any reliable day-to-day way).  PS 5270.09 lists "quarters change" as an explicit disciplinary sanction because it is so disruptive; no one wants to be moved against his will, particularly when it amounts to a practical demotion in qualtiy of life.  I believed this move (and others) to be retaliatory, at least in part based on my having both-ered Mr. Morris again with my request, and generally because of my institutional record (which, as previously stated herein, staff are required to review on a regular basis and which contains biased interpretations which indicate, as staff have referred to it in my presence, that I had "tried to rape a retarded kid") and history of complaints.  I explained that the circumstances of this most recent move were so egregiously wrong, so blatantly improper, as well as detrimental to me for a number of reasons including with respect to my tendency to be sexually victimized in E6: Specifically, Mr. L. Ingram, Counselor in E6 (but not the one to whom my case was assigned) had apparently swapped (in absentia, i.e., he did not personally issue te order) my entire 5-man cell's inhabitants with those of his pet inmate (who is the one who actually issued the directive to move), thus favoring the pet inmate (and the hand-picked associates of same) to the detriment of me and those in my cell.  Mr. Ingram later explained that the punishment had been justifiably imposed because the pet inmate and his associates had alleged that sexual activity had occurred in, or involving occupants of, the cell in which I had been housed -- which,

- 30 -

true or not (and I can only aver that I knew nothing of such occurring), would only make it more shocking and irresponsible, given my complaints of sexual victimization, if staff conducted no investigation thereof and simply kept the makeup of the cell undisturbed. I regard Mr. Ingram's excuse for his favor to his pet inmate, as I know that all involved parties do, as bogus without qualification; for that reason, we as a group went to speak with the Captain, who as head correctional officer over the nearly-2000-inmate compound represented himself as a respectable law-and-order type who would brook no such misconduct, Mr. M. Crittle. He, along with Mr. Morris (with whom I separately spoke on 5/28/2016, and who responded to my 5/26/2016 message on 5/30/2016), deferred to Mr. Ingram, the staff member with immediate authority over intra-unit moves in E6.

71.  My complaints about the sudden and unprovoked intra-unit move progressed to repetition of my request to be restored to A5 Unit; on 6/6/2016, Mr. Morris again denied my 5/31/2016 written request to that effect. My 6/6/2016 response thereto advised that I would "take my chances with available channels for appeal," repeating my contention and understanding that "sexual harassment and unwanted sexual contact are sufficient grounds to request removal to a unit which is demonstrably safer," and explaining that other similarly-situated inmates were treated differently. Mr. Morris, on 6/7/2016, referred me to the PREA Coordinator and the SIS (Special Investigative Supervisor) Office; and I was interviewed first by Dr. Caperton and then by Lt. Gates with another officer, to all of whom I -- following much cajoling due to my fear of repercussions from the homosexual "cabal" at SEA running the facility's practical concerns -- revealed the names of both the primary perpetrator of sexual assault upon me as well as a witness thereto, both of whom were also subsequently interviewed and, they told me afterward, corroborated the essential facts. (The perpetrator had confronted me violently immediately after having been interviewed, but nothing was done by staff to protect me or to improve my condition, even after I, on 6/11/2016, asked Mr. Morris "[i]n light of this rationale" to approve a third prearranged swap; on 6/13/2016 he again denied my request, while all around me others were freely moved for the most whimsical of preferences.)

72.  Immediately thereafter, also on 6/13/2016, I repeated my concerns in writing to Dr. Caperton, explaining the circumstances surrounding the approval of the move(s) by staff and their failure to implement any such solution despite my complaints of sexual harassment, inappropriate touching, sexual propositioning, aggressive confrontations, etc. Dr. Caperton had spent a good deal of time seemingly sympathizing with me during the interview because I had been skeptical that I could be pro-tected if my having named the aggressor were to become known. She had seemed surprisingly considerate and, because I had revealed some of my personal feelings, I thought that she understood a little of what I had been going through and why I needed to not be constantly in the presence of and subjected to that kind of abuse. When, following Lt. Henderson's advising me on 6/28/2016 that my PREA allegation had formally been deemed "unsubstantiated" (as per 28 C.F.R. §115.5, this term is defined as there being "insufficient evidence to make a final determination as to whether or not the event occurred," as contrasted from "unfounded"), I addressed Dr. Caperton again to ask how that could be (given the interviewees' corroboration) and to seek support and help with my ongoing victimization and the distress that continued exposure thereto was causing (including severe sleep deprivation, being made to sleep in an open environment where I would not unfrequently be grabbed by sexual predators even in the night, among many other affronts), she responded in a curt and uninterested way, simply agreeing that I could appeal if I was unsatisfied. I believe that the PREA investigation was not just mishandled and mishandled in violation of regulations but that it was deliberately mishandled in a manner intended to propagate harm to me. These electronic exchanges ran through 6/30/2016.

73. On or about 6/14/2016, an inmate groped my CENSORED in E6. I responded by angrily chasing him away and yelling at him, and he several minutes later apologized and stayed away from me thereafter. Because of the way in which my previous complaints had been handled, I knew that reporting specifics of these types of incidents could not help and could only hurt; but witnesses to the assault persuaded me at least to persist in my general efforts by submitting a BP-8 (one of four BP-8s submitted along with one BP-9) on 7/3/2016.

74. On 6/15/2016, I placed in the unit outgoing mailbox my reply to a letter written to me by my years-long friend Martina. Her letter spoke of a wedding she would attend, describing the special bond between the couple, and referenced my last letter to her (written 4/29/2016-5/15/2016) in which I had mentioned ''a testament to the depth of our bond." Martina wrote: "Yes, go into detail about [that], I'd like to read about it, about your thoughts, about the way this bond makes us feel. Out of curiosity, one question: do you express yourself in person the same direct way as you use while writing?" She then went on to share with me the basics of the Cyrillic/Russian language course she was taking, spelling a greeting and my name and describing the pronunciation for me.

75. On 6/17/2016, I was issued an incident report (#2862705) dated 6/16/2016 and charging a violation of disciplinary Code 306 ("Refusing to Work or to Accept a Program Assignment"). Ms. M. Zuver had, at 4:00am on 6/16/2016, arbitrarily opened, read, and flagged my sealed mail, alleging, as per Dr. Poulson hours later, that the contents of my letter -- specifically a floral turn of phrase describing the connection between Martina and myself ("... CENSORED [Due to the obviously volatile nature of the restrictions upon my writings, including the vagueness of relevant definitions, I, not being a free person, cannot write here the words the writing of which was violative]") -- violated the active CMP's prohibition on my "corresponding in a sexual manner with any member of the public."

76. Mr. Ingram chaired the UDC, on 6/21/2016, at which hearing he refused to allow my presentation of evidence and witnesses in my defense. Specifically, I sought to submit Martina's letters to provide context for the communications at issue, as well as to offer her telephonic testimony to show that such a communication -- completely devoid of sexual terms -- was not sexual in nature as interpreted by the persons conducting the correspondence. Mr. Ingram told me that he was there to do one job only: to find me guilty -- and that I could raise my evidence on appeal, but that he did not want to see it. (My repeated efforts to submit the materials I carried were met with abrupt, sharp warnings. Other staff members were present, but spoke not a single word throughout the hearing.) Mr. Ingram then found me guilty and sanctioned me to 30 days' loss of Commissary.

77. I appealed this action via BP-9 on 7/3/2016 by Administrative Remedy Request #868520, repeating my assertion that the quoted phrase was figurative and poetic in nature and that it was made in direct response to Martina's request that I go into detail about a testament as to the depth of our bond and how it makes me feel. I attached a copy of her letter and argued that neither the CMP nor Code 306 could apply to my written conduct, asking that the UDC action be reversed, the incident report expunged from my record, my mail returned to me or forwarded to the intended recipient, and that such incidents not occur in the future. On or about 7/27/2016, Warden D.J. Harmon denied my BP-9 and stated in response that my letter to Martina was being held as contraband, specifically denying expungement and return/processing of the seized mail. On or about 8/11/2016, I appealed that denial to the SCRO, and on or about 9/8/2016, Mr. Keller (Regional Director at SCRO) granted a rehearing in the matter. On or about 10/1/2016, I appealed this decision as effectively nonresponsive, particularly as much damage had already been done: I had lost all contact with Martina, the letter still had not been returned or passed on, and several staff

had affirmed, in response to my detailed inquiries, the (mis)characterization thereof as "risk-relevant" (that is, that it reflected an articulable risk that I would commit a future criminal sex offense, and thus could merit civil commitment, much as would a sex offender's being found collecting pictures of children or trying to contact a child victim), and all of this was on my permanent prison record as stored in PDS for the express purpose of evidentiary use against me in proceedings to bring about my indefinite confinement beyond the date of expiration of my criminal sentence.  The appeal was receipted at the BOP Central Office on 10/17/2016 and no response has yet been forthcoming; on 10/28/2016, though, my assigned Counselor Mr. A. Perez expunged the incident pursuant to the directive of the SCRO on "rehearing" (a favorable kangaroo court which he alone chaired and at which I was still not allowed to present a defense); PDS records yet remained.

78.  Also on 7/3/2016, I submitted a BP-8 seeking that the mail seized on the morning of 6/16/2016 be returned or mailed and that such confiscation and interference not occur in the future.  Therein, I referenced an electronic exchange that I had conducted with Dr. Caperton from 6/17/2016 through 6/30/2016 in which I had explained my immediate reaction to issuance of the incident report (#2862705) in seeking a reasoned review, and to which she responded that my words to Martina "ha[d] a sexualized connotation" and stated: "I do not have your mail."  The BP-8 was returned by Mr. Ingram on 8/11/2016, signed by Mr. Morris, and on or about 8/12/2016 I submitted my BP-9 claiming ongoing improper mail handling, disputing the characterization of my words as sexual or risk-relevant, and requesting a review of procedurs, proper processing of the letter, and that the issue not recur.  This submission was denied by Mr. Harmon (in Administrative Remedy Request #873378) on or about 8/24/2016, in which he declared that the letter "will not be returned" as "appropriate handling procedures were utilized as referenced in [PS] 5521.06" and that the letter, deemed "risk-relevant," was thus "appropriately confiscated." I appealed this denial on or about 9/5/2016 in part because its reference to the PS appeared utterly irrelevant, and maintained that the letter was not "sexually suggestive" as implied by Mr. Harmon, insisting that the definition of "risk-relevant" was improperly applied, and demanding the return of seized written material and adherence to policy.  On or about 9/21/2016, Mr. Keller denied my appeal, relying on PS 5324.10 and finding no evidence of staff performance "outside the scope of their employment."  This determination of the SCRO I also appealed on or about 10/25/2016, further contesting the authority of staff to confiscate mail on grounds related to an assessment of "inappropriate behavior" because "no policy authorizes this wholesale interference with my communications and relationships," repeating my earlier demands.  The BOP Central Office Administrative Remedy Coordinator, on or about 11/30/2016, rejected this appeal as untimely despite my explanation therein as to the delay in my receipt of the answer from the Regional Office, advising me in writing that I must provide "staff verification stating [the] reason [that the] untimely filing was not [my] fault."  I approached unit staff in charge of handling such paperwork (Secretary Ms. E. McCoy), who advised that such verification was not possible as no log was kept as to the relevant information.  I then approached Mr. Morris to confirm this fact in writing, and sent that document along with the earlier-submitted materials back to the Central Office.  Another rejection notice was then issued thereby, dated 1/19/2017, indicating: "You reference your BP-8 in your BP-9, for that reason you must attach your BP-8," even though I had absolutely included my BP-8 in the packet I mailed; nonetheless, I resubmitted the entire packet along with another copy of the BP-8 to the Central Office on or about 2/3/2017, and remain awaiting a response thereto.

79.  Also on 7/3/2016, I submitted another BP-8 as to my assertion that the CMP, insofar as it negatively affected my relationships, e.g., as had occurred vis-a-vis my mail with Martina, and is destructive, unduly repressive, promotes mis-

handling of my case and violation of my rights, and as such should be withdrawn.
Mr. Ingram returned this form, along with a reprise of Dr. Caperton's 4/17/2014
claim that a "CMP in no way interferes with efforts to build healthy relation-
ships [because] behavior ... in violation of the CMP is [per se] not a healthy
choice" (thus denigrating my friendship with Martina, for example, where it in-
volved an expression as to the "depth of our bond," and my relationship with Mei,
e.g., where it contained intimate aspects, as unhealthy), signed by him and by
Mr. Morris, on 8/11/2016.  I then, on or about 8/12/2016, submitted a BP-9 as to
the issue, disputing Dr. Caperton's posture that the CMP had been implemented in
proper accord with PS 5324.10 and alleging that it promoted unwarranted inter-
ference and disciplinary action in response to allowable exercises of my rights,
as exemplified by, inter alia, the recent incident report and UDC action.  This
Administrative Remedy Request (#873385) was denied by Mr. Harmon on or about
8/24/2016, in a response that summarily neglected to address the issues.  I ap-
pealed the denial on or about 9/5/2016, maintaining my claims and requests.  The
response of Mr. Keller at the SCRO, dated 9/21/2016, mischaracterized the record,
stating that staff had counseled me as to "risk-relevant behaviors which suggest
problems with empirically-supported risk factors for reoffending" (staff had never
explained to me what constitutes RRB in my case, save for the printed list of vague
restrictions comprising the CMP and my own ability to read the policy definition
in PS 5324.10 as cited herein) and that my conduct such as met the purported cri-
teria for RRB "included requesting sexual materials through the mail" (this never
happened; the record clearly reveals that Ms. Lasseter on 5/16/2012 acknowledged,
based on written evidence in the possession of staff, that I had not requested
such material).  Nonetheless, as Mr. Keller advised, the CMP imposed in 2013 as
a result of the two 2012 incidents was lifted in 2014 and I was "subsequently
transferred to a non-SOMP institution" (i.e., FTD).  Mr. Keller  recited further
that I then "engaged in new [RRB] by engaging in sexually explicit correspondence
with another person" (my contention having been that, since the "other person"
was my fiancee and since I was not on a CMP and had no reason to believe that the
carriage of such an interaction by way of written expression could negatively
impact me or implicate the public definition of RRB contained in printed policy,
a reasoned evaluation, in contrast to a categorical abuse of discretion -- partic-
ularly in the flip-flop manner evinced by the records of 7/1/2015-7/2/2015 indic-
ative of retaliatory intent -- would have revealed that the correspondence did not
trigger administrative action, but only personal and malicious animus).  Mr. Keller
wrote that the second CMP (which relied on the mischaracterized incidents having
comprised the first CMP) was specific and detailed as to its clinical basis (which
I dispute) and "applied appropriate restrictions on [my] activities, including [my]
communication with others, in an effort to appropriately modify [my] behavior" (I
interpret this intent to "modify" my connections with other people as violative
of my essential Constitutional rights), and denied my appeal.  So I continued the
filing by way of a BP-11 to the Central Office on or about 10/25/2016.  In a
notice dated 11/23/2016, the Administrative Remedy Coordinator there rejected
Administrative Remedy Request #873385 for reasons identical to those indicated
in its 11/30/2016 notice for #873378.  I responded on or about 12/21/2016, in
the same manner, including a copy of the same declaration by Mr. Morris indicating
that staff are unable to provide the demanded verification.  As a result, on or
about 1/17/2017 the Administrative Remedy Coordinator at the BOP Central Office
issued a receipt showing that office's acceptance of the filing as timely, and
projecting a response by 3/4/2017 (which has yet to arrive).

80.  I also submitted to Mr. Ingram on 7/3/2016 a BP-8 seeking medical attention,
which issue was subsequently resolved when, in explicit response to the BP-8,
Physician's Assistant (P.A.) Mr. L. Brockman of the U.S. Public Health Service

conducted a medical examination and provided appropriate treatment. However, despite my 8/23/2016 request by electronic cop-out, I was not given a copy of the completed BP-8 form as to this issue.

81. I also submitted to Mr. Ingram on 7/3/2016 a BP-8 raising the issue of the mishandling of my request for removal from Unit E6 and the related PREA investigation. As with the medical BP-8, I never received a formal written answer to this submission, but at some point in or around August of 2016 Mr. Ingram sought me out at the prison law library and escorted me across the compound to see Mr. Morris, who said to me: "I think we've made you wait long enough. You still want to move to 5 Building?" I agreed as briefly as possible and was, within hours, moved from E6 to A5, to my immense relief.

82. On 9/22/2016, I reported to a 7:30 call-out with Dr. Maria Douglas, Psy.D., who is a Drug Abuse Program Coordinator (DAPC). A group of inmates were there as well. Dr. Douglas distributed sets of forms to all of us and directed the group exactly where to sign on each, advising us to bring the completed packets as she called us one by one. I did as told and when it was my turn with Dr. Douglas she explained that she was interviewing for RDAP (Residential Drug Abuse Program) participation. I immediately told her that I'd already been interviewed about a month prior by Dr. Stanley for that purpose and, given my PRD (projected release date) of 2024 and a preference to take the program at a time when personal circumstances would not distract me from success (my being throughout this period consumed by relationship difficulties and legal battles on two fronts, that is, with respect to my criminal judgment as well as the instant civil litigation), had declined participation at the present time. She accepted my explanation but persisted in asking about my substance abuse history. As I left the meeting and waited with other inmates to leave on the next "open move" (8:20), I learned that staff sought to fill up the newly-designated RDAP building (D54); accordingly, upon return to A5 Unit, I sent (at 8:43) an electronic cop-out to Dr. Douglas "to ensure in writing that no negative consequences can arise from my insistence on delaying my enrollment."

83. Dr. Douglas's 9/22/2016 response (later the same day) indicated that she could either withhold the paperwork (i.e., not submit it to DSCC for an "eligibility review"), thus not putting me on the "wait list," or -- her preference -- I could "stay on the wait list, have the documents sent and wait and see if [my PRD] is even called come November" (explaining that I couldn't be in the scheduled October group and the large amount of time until my 2024 release date militated against a likelihood of enrollment in the next group; "prior to the start of that program [Dr. Douglas] would be meeting with folks to discuss" whether they would opt to participate). I replied on 9/23/2016 (the next day) to confirm, repeating my consistent position, that I did "NOT" want to be on the "wait list." Dr. Douglas replied almost a week later, on 9/29/2016, that I "will need to come by and sign refusal documents."

84. At about this time I was also forced out of participation in the prison band program, in which I had participated (mainly as a drummer) for years. The circumstances involved the homosexual demands of inmates to whom staff had delegated control over the program and staff dissemination of private information from my record and communications sent electronically to supervisory staff to those inmates having special authority; instead of continuing to allow my access to band-program privileges, my increasingly-vehement refusals of sexual propositions prompted the development and maintenance of rumors, based on messages I had sent to staff which had been inappropriately shared with the same inmates and recharacterized as "rat" or "snitch" attempts, against me, culminating in my complete expulsion from the program in retaliation (as well as because staff favored kinds other than mine).

- 35 -

On 10/2/2016, I confirmed in writing to Mr. E. Wesley, Recreation Specialist in nominal charge of the band program, that I would not be participating going forward, and attempted to follow up verbally with Mr. Boykin, who had been involved with the cop-outs between me and staff which had been given to inmates having practical authority over the program.  Mr. Boykin was repeatedly evasive and refused to meet with me about the issue, saying "it's resolved, it's resolved." I then attempted to address this sensitive issue with Supervisor of Recreation Mr. F. Tavares in writing, but never received a response and was never contacted.

85.  On 10/4/2016, Ms. Barroso ordered me to move from my 2-man cell with a friend and crucial support of five years in A5 (to which I had only just returned less than two months previously after almost a year of issues in E6) to D54 Unit.  I advised her that I had declined RDAP participation twice, but of course obeyed the order pending resolution.  I approached Dr. Douglas directly on the compound, as well as Dr. Stanley in D54 and Mr. Pettit (who, as Counselor over D54B inmates, explained to me that Dr. Douglas had moved several inmates who did not intend to participate and that all of us would be returned to our originating units as soon as possible), and memorialized, by my reply to the ongoing electronic exchange with Dr. Douglas, her verbal instruction to me that I "sign refusal documents" to get out, which signing, as she memorialized in kind, occurred on 10/6/2016.

86.  On the evening of 10/4/2016, upon moving into D54, I found myself surrounded by inmates who threatened my physical well-being, including one who had perpetrated serious sexual abuse upon me in the past (i.e., he had physically groped me, cornered me in hidden locations, constantly made lewd comments and gestures toward me, watched me in a demeaning sexual manner, propositioned me for vulgar sexual activities repeatedly, had attempted to force me to submit to his sexual advances by threatening to disallow my access to privileges over which he had been delegated staff control, offering, in the inverse, privileges in exchange for sex, and otherwise victimizing me generally).  The presence and harassing conduct of these inmates now that I was locked in with them, communicated primarily through "looks" and "stalking" me around the unit and into the bathroom, watching me as I tried to sleep or went to the shower, etc., was so distressing to me as to send my anxiety levels through the roof.  I felt horrible and could not sleep.  I also viewed the circumstances which had led to my being thrown into D54 as wrongful, not just because I had declined voluntary RDAP placement but also because other inmates were not treated the same ways as I was being treated (as emphasized by a bulletin posted as to responsibilities with respect to voluntary enrollment and moving into or out of D54) and because, above all, this treatment was resulting in further exposure to the kind of sexual abuse and harassment I had finally escaped in E6, and amounted to blatant mistreatment by the constant transplanting.

87.  As early in the morning on 10/5/2016 as was physically possible (I had stayed up all night, unable to sleep, waiting for the opportunity), I wrote to the D54 Unit Manager (Mr. E. Johnson) to complain of these problems.  (An inmate's telephone and computer access are -- incredibly, considering their irreplaceable value in making urgent requests for help in a place where ordinarily one officer is assigned to several hundred inmates per unit and most of the time is completely out of sight, often not even locatable -- unavailable until the day after an inter-unit move: not even the emergency "Crime-Stoppers" or "Rape Crisis" hotlines are accessible in such situations.)  I also called my family in great distress to complain of my condition and discuss options.  Mei suggested that I allow my mother to contact a congressional official, as she had previously offered but which I had put off.  I conceded only to the extent of supplying my mother with relevant information so that she could make such a contact if necessary, but advising her that my permission for her to do so was contingent only on the event that I was unable to contact her for an extended period of time (e.g., if I had been harmed, etc.). I never received any response or acknowledgment from Mr. Johnson.

- 36 -

88. On 10/6/2016, I was ordered by Dr. Douglas to be seated in a room with Mr. Harmon (the Warden), Dr. Cimperman (the Chief Psychologist, now Dr. Lauren Carter, Psy.D.), and herself.  Mr. Harmon opened by telling me gravely that he was "pissed off" at me.  He asked me whether I knew why.  I mentioned the electronic cop-out which I had sent to Mr. Johnson only the morning before, but he appeared not to know anything about that.  He explained that this was in reference to my phonecalls with my family the preceding day in which, according to him, I had manipulated them to contact a congressman about "his" prison.  He spoke angrily but evenly, and thus menacingly in consideration of his obvious omniscience and omnipotence. Having been under so much strain caused me to cry, as Dr. Cimperman accused me of not having properly handled my complaints of sexual victimization.  She said that the Warden is always available to talk to, but he is not: I hardly ever see him.  She said that I had not tried to talk with staff about my issues before speaking with family about them, but that was untrue, as well as irrelevant unless, as I learned, the objective was that I not speak freely with persons outside the prison.  She and he both (Dr. Douglas remained silent) repeatedly implied that if I was really in trouble I would have behaved differently than I had and thus that my excitation of my family was wrongful.  They wanted me to correct that impression by calling off my mother's efforts to involve a member of Congress.  Dr. Cimperman argued with me about the history of my sexual abuse complaints, and misquoted portions of my record (which she and I later corrected in private conference in her office, resulting in amendments to my PDS file).

89.  As I wrote in an electronic cop-out to Dr. Cimperman later that same day, both she and Mr. Harmon had been aggressively attacking me: She had claimed, for example, in the meeting that as soon as I reported the sexual abuse in E6 I was promptly separated from the perpetrator; my honest denials of that assertion were treated like lies: She either had had the wrong facts or simply wasn't prepared to concede that I would have been so badly treated on her (and the Warden's) watch.  Dr. Cimperman and Mr. Harmon had made me feel like I was at fault for the months of hell I'd gone through surrounding my complaint, and made me afraid to thereafter speak out to family or outside parties; I called my mother after the meeting to tell her that I was OK and not to involve the congressman, as well as to honestly apologize if I had upset her (she appeared not to feel that such was necessary, and told me she understood, which highlighted -- to me -- the fact that my interactions with my relations are private for a reason, and that they make sense in context, and that when people like the Warden or the Unit Secretary interfere, they run a substantial risk, like Mr. Rogers and Dr. Poulson, and those staff made to read the resultant reports afterward, of misinterpretation out of context); her later suggestions to involve the same congressman I likewise "put down" or "squashed" out of fear of further reprisals, explaining at one instance that, unlike a citizen's lodging of a grievance with an administrative agency in ordinary situations, a prisoner's similar act is imbued with an essentially different spirit, involving not some external object like a tax return or a property claim but his actual self, his being, his expression, his physical life, his existence in terms defining the frontiers of his mind and body as captives of the entity with which he takes issue -- which entity (the BOP) is comprised of humans, Americans, subject to at least as much prejudice as any other but with immense power over individual lives and the most unobtrusive oversight of any public service ever conceived.

90.  The degree of "spin" transmitted by the 10/6/2016 meeting was so powerful that, even though I was still suffering greatly, to avoid further "pissing off" the person on whose desk the buck stops at SEA, I put my head down and endured what I needed to endure in order not to rock the boat.  I jumped through the hoops held aloft for me by staff to get out of D54 and back to A5, limiting my complaints to Dr. Cimperman who had adopted a receptive role with me.  I told

her that I believe that I was treated that way by Mr. Harmon in retaliation for my having reached out for help and for expressing my concerns to my family over the phone. I said that I felt that I would not have been treated that way if my prison record didn't make me look so despicable, as a result, in part, of the mischaracterized and false renditions of the "Alex" incident in PDS as well as the more recent "Martina" incident; I pointed out that my record, which unlike the majority of prisoners' records was mandated to be reviewed by staff on a regular and frequent basis, made it look to the people in charge over me as though I deserve to be abused. Dr. Cimperman continued to insist that none of what had happened to me rose to an "actionable" level, and whatever little trust had been garnered when Dr. Caperton soothed me into naming names for naught had been eroded quickly since: Their associate, Dr. Jenica Ottero, Psy.D., actually failed to record another such incident of which I had told her for similar reasons of insufficiency (I had been cornered in a supply closet and sexually propositioned). Dr. Cimperman's 10/11/2016 response to these rants blamed me for not having further reported that, after initial reports brought staff investigation, nothing had changed or improved: But I had, in fact, continued to file paperwork and request removal from E6 on the same rationale until it did happen. She mentioned that I did not inform Dr. Douglas, but that was because I had informed relevant staff. I explained that I felt like no matter what I did she would find a way to say that I had missed something important. I did 3 of the 4 things on the "Everyone Has a Right to Be Free from Sexual Harassment" bulletin, and I dared not do the fourth (send a message to the Office of the Inspector General), not just because that was supposed to be for staff sexual abuse and not inmate sexual abuse, but because that is exactly what the Warden didn't want me doing: Going over his head or outside the prison. Overall, the 10/6/2016 event put me on notice: Another inmate (Schorr) had been put in the SHU for talking to the media over the phone, another (Smith) transferred for his use of the grievance process, and a third (Donnell) threatened for complaining to the Correctional Services Department (which electronic mailbox has never rendered a response to my inquiries, further making clear that I had better sit down and shut up).

91. On 10/11/2016 I was returned to A5 Unit from D54 Unit, having spent one week there.

92. On 10/12/2016 I was ordered by Ms. Barroso (who told me that the directive had come from Mr. Morris and implied that it had been the subject of discussion at the institution's weekly Wednesday morning briefing, i.e., that the opinion of Mr. Harmon as Warden may have driven the decision) to move to F10 Unit, which amounted to the tenth bunk and the fourth building to which I had been assigned over the preceding year, an entirely extraordinary experience as compared to that of probably any other inmate at that institution or any similar one, none of which moves (save my general request to be housed in A5) had been at my request. I addressed Mr. Morris immediately and asked the reason for the change over the preceding 24 hours; he said that F10 "is where you need to be right now" or some similar platitude. I wrote to Mr. Harmon asking him to reverse the move, and received no response whatsoever (despite that at other times the mailbox has been monitored and answered); I construed this ominously to be the final echo of Mr. Harmon's warning against speaking out, complaining, making noise -- because staff can and will handle me with impunity.

93. In F10, I was assigned to the dayroom. While most cells in F10 Unit are 2-man spaces (it formerly housed Japanese, Italian, and German internees pursuant to Executive Order 9066, which abused 120,000 Americans on account of their races, and was only repealed by Proclamation 4417 well over three decades after Pearl Harbor), areas called "dayrooms" were originally used for indoor recreation, but

- 38 -

have since been co-opted for bed space (contributing to overcrowding and stress).
This dayroom held (and holds) 14 men (the term being used in the general sense),
leaving no space in the building for recreational pursuits of an above-board char-
acter; immediately upon my arrival, I was "Welcome[d] to the 'gayroom'!" by the
inhabitants.

94.  As soon as I was made to witness sexual activity in the "gayroom," I filed
another BP-8 (on 10/15/2016).  On 10/25/2016 Mr. Morris personally answered it:
"Your unit team believes F Unit is the appropriate housing unit for you  at this
time."  On or about 11/16/2016 I submitted the consequent BP-9 (assigned #883425)
in which I explained at great length the retaliatory and harassing conditions of
my experience to date, including Mr. Harmon's anger at my communications with
family and supporters about involving a member of Congress, general repression of
my relationships and contacts, retaliatory moves and associated exposure to sexual
victimization, and mishandling of related complaints.  The response signed by
Mr. Harmon on 12/5/2016 stated that my "concerns have been forwarded to the approp-
riate official for consideration and any necessary action."  That "action" turned
out to be that I was expressly warned by staff not to file any further if I did
not want to keep getting treated this way, with particular reference to the con-
stant moving of my quarters and what is called "diesel therapy."

95.  On or about 11/9/2016, my friend Martina submitted a letter to the institution
explaining that she is my friend and would like to correspond with me without undue
interference.  I also received her letter to me dated 8/27/2016 at approximately
the same time [in which she mentioned something that I can't repeat in this docu-
ment, as elsewhere herein, due to restrictions in my CMP and the fact that such
have arbitrarily been applied to punish me irrespective of context].  The receipt
of this letter, delayed and thus obviously having been subjected to review, only
further obscured my understanding of the definition of RRB as applicable to my
case: The last incident report (#2862705) had already been reversed and expunged,
but only after I had served the punishment fully (much as with the 2012-2013-2014
proceedings), and no formal clarification flowed from that flip-flop; moreover,
Dr. Caperton persisted, through Dr. Cimperman, in maintaining the record in PDS
which stated that my expression was indeed classified as RRB and thus competent
civil commitment evidence.  I believe that this vagueness violates my First Amend-
ment and Fifth Amendment rights, and that it is at the root of other violations.

96.  On 12/2/2016, I supplied several documents to Dr. Cimperman relevant to the
expungement of records related to the CMPs remaining in my PDS file.  They showed
that both the 6/16/2016 incident report for my letter to Martina and the "Alex"
incident report (#2394613) had been expunged, on 10/28/2016 and 3/23/2015 respec-
tively.  Both alleged violations, as originally recorded by one-sided reporting
staff, remained in my PDS record and supported the CMPs, despite their direct
contradiction by the true facts.  The conclusions -- that my composition for Alex
was an attempt to abuse or otherwise constituted RRB, that my letter to Martina
was sexual in nature and also constituted RRB, that my intimate relationship
with Mei and my expressions in my capacity as her fiancee constitued RRB as well,
etc. -- placed by staff on my record are false and even fraudulent in terms of
their biased construction in the face of available evidence to the contrary which
investigation, or allowance of due process where I sought to supply information
the consideration of which was refused as described herein, would have shown; and
because of the import of these records, including the CMPs, as relate to my liberty
interests and rights under the Constitution, I believe that my treatment and the
manipulation of my case comprise violations as pled herein.

97.  On 12/5/2016 and 12/6/2016, I addressed related concerns to Dr. Caperton and
Dr. Cimperman asserting that these deliberate actions were harmful to me, partic-
ularly because any due process afforded at a future civil commitment proceeding

would be some dozen years removed from some of the incidents at issue and thus
that the recording of biased information in my prison file prejudiced me given
that it was entirely unlikely that witnesses on my behalf and evidence in my
favor could be preserved or made available at that later date where I, as a
confined and captive (and restricted, by the CMP especially) prisoner, was utterly
unable to address these needs or to prepare for such an eventuality -- thereby
increasing my risk of permanent or indefinite confinement by civil commitment,
plainly the objective of the actors as pled herein. I asked that the operative
CMP be lifted, and pointed out that, previously, mail which had been reported
as potentially comprising RRB and then deemed innocuous had counted as a "cleared
search," and that, on 4/17/2014, Dr. Caperton had advised me that two cleared
searches, usually within a year, are necessary for removal from a CMP, as well as
that, on 5/20/2014, Dr. Poulson, upon entering such a cleared search in my PDS
file, indicated that inmates on CMPs "are to have their property regularly searched
to ascertain whether they are taking corrective action and managing their sexual
urges in a healthy manner" -- but that, on 12/5/2016, Dr. Caperton advised that a
"prolonged period" was now necessary (and she had previously, on or about 9/29/2015,
advised that this directive came from Dr. Bickart) for my case only, which I took
to mean "never." I explained repeatedly throughout these communications how impor-
tant it is to me and to my family that I be able, by some managing of my conduct,
to return to FTD where my mother and other supporters can visit me and where I can
do some good, both for others and for my own rehabilitation toward successful rein-
tegration into society (including marriage). I explained how I feel isolated and
filtered, and at the mercy of oppressors, and with no clear recourse.

## CERTIFICATE

I hereby certify that on the date subscribed hereto I caused

the foregoing Complaint and associated Affidavit of Poverty, etc.,

to be filed by placing it with prison officials for mailing, first-

class postage pre-paid, in accordance with institutional "special

mail" procedures and the "prison mailbox rule," addressed as follows:

> UNITED STATES DISTRICT COURT
> DISTRICT OF NEW JERSEY
> P.O. BOX 2797
> CAMDEN, NJ 08101

I hereby affirm, under penalty of perjury, that the foregoing

is true and correct. 28 U.S.C. §1746.

Executed on _5/22/2017_

MICHAEL BERK